Ben HAMMOND, Plaintiff,

v.

AUBURN UNIVERSITY, et al., Defendants.

Civ. A. No. 86–D–0996–E.

United States District Court, M.D. Alabama, E.D.

Sept. 24, 1987.

Stephen M. NeSmith, with the firm of Riggs, NeSmith & Halstrom, P.A., Montgomery, Ala., for plaintiff.

Thomas D. Samford with the firm of Samford & Samford, Locker, Opelika, Ala., Joe Espy, III, and Les Hayes, III, with the firm of Melton & Espy, Montgomery, Ala., for defendants Martin, Emert, Brandt, Irwin, Weaver, Bamburg, Cunningham, Denson, Holloway, Lowder, McCartney, Nichols, Savage, Steagall and Tatum.

## MEMORANDUM OPINION

DUBINA, District Judge.

This cause is now before the Court on a motion for summary judgment filed herein by defendants Bamberg, Cunningham, Denson, Holloway, Lowder, McCartney, Nichols, Savage, Steagall and Tatum (Auburn University Board of Trustees) on June 22, 1987, and by defendants Martin, Emert, Brandt, Weaver and Irwin (Auburn University officials, administrators, and professors) on August 10, 1987. Pursuant to said motions, the defendants seek an order from this Court granting summary judgment in their favor and against the plaintiff for damages in Counts One, Two and Three and for prospective injunctive relief.[1]

In support of said motions, the defendants rely upon all pleadings of record, affidavits of the defendants, depositions of the defendants and attached exhibits, and the deposition of the plaintiff and the affidavit of James E. Blackburn, Dean of the College of Education at Auburn University.

On July 6, 1987, the plaintiff filed a response in opposition to the defendants' motion for summary judgment. The plaintiff subsequently supplemented that response by filing a memorandum brief with exhibits and his own affidavit on September 1, 1987. Pursuant to said response, plaintiff relies on all pleadings of record, Exhibits A and B, a memorandum brief, and Exhibit 1, and various portions of the depositions of defendants Martin, Brandt, Irwin and Flynn, and Dean Blackburn of the College of Education at Auburn University. The Court heard oral arguments on September 4, 1987, on the defendants' motions for summary judgment.

During oral arguments, the plaintiff conceded that there were no material facts in dispute and that this Court could dispose of the issues in this cause as a matter of law.

The plaintiff brings this action pursuant to the provisions of 42 U.S.C. § 1983.

## I. FACTUAL BACKGROUND

The plaintiff enrolled as a student at Auburn University Main Campus (hereinafter "Auburn") in the summer of 1982 in the College of Engineering. Prior to his enrollment at Auburn, the plaintiff had taken a Bachelor of Arts degree in history from Birmingham Southern College in 1971 (p. 10, plaintiff's deposition). In 1972, the plaintiff received a secondary teaching certificate. The plaintiff also attended Auburn University at Montgomery from the spring of 1980 until the summer of 1982 (pp. 14 and 15 of plaintiff's deposition). Upon entering Auburn in 1982, the plaintiff was classified as a senior with 87 hours of course work in electrical engineering to complete before becoming eligible to graduate with a degree from the College of Engineering at Auburn. (Irwin deposition,

---

1. Count Four of the Complaint alleging conspiracy was dismissed for failure to state a claim upon which relief could be granted on April 7, 1987, by this Court.

p. 32.) Although the plaintiff needed only 87 hours to earn his degree, he attempted 195 hours over the course of the next several years in an effort to maintain a grade point average sufficient to keep himself enrolled at Auburn. (Irwin deposition, p. 33, defendants' Exhibit A.) The plaintiff sustained great difficulty with the electrical engineering curriculum as is evidenced by the large amount of tutoring he received. (Defendants' Exhibit B.) Despite these efforts on the part of the plaintiff, he was placed on both academic probation in the summer quarter of 1983 and on academic suspension in the fall quarter of 1983. The plaintiff continued on academic probation through the summer and fall quarters of 1984. (Plaintiffs' deposition, p. 21 and defendants' Exhibit A.) The plaintiff admitted that he was aware of his grade situation and the courses he was failing. (Plaintiff's deposition, pp. 53 and 65.) In twenty of the twenty-six electrical engineering classes taken by the plaintiff, he received either a *D* or an *F* mark as an evaluation of his work. In September of 1985, when the faculty of the College of Engineering informed the plaintiff that as a result of his unsatisfactory performance he would not be allowed to register for additional electrical engineering courses, the plaintiff had achieved a 0.94 grade point average on a 4.0 scale in electrical engineering courses. (Defendants' Exhibit D.)

When the plaintiff entered Auburn as a student in 1982, the requirements for graduation with a degree in electrical engineering stated in the 1981–82 Auburn University Bulletin (hereinafter "82 Bulletin") were as follows:

DEGREE REQUIREMENTS

To earn a bachelor's degree from the School of Engineering, a student must complete in his curriculum and must have a cumulative average of at least 2.00 on all work attempted at Auburn University. (Page 143.)

The "82 Bulletin" also contained the following caveat on the first page which reads as follows:

The University reserves the right to make changes as required in course offerings, curricula, academic policies and other rules and regulations affecting students, to be effective whenever determined by the University. These changes will govern current and formerly enrolled students. Enrollment of all students is subject to these conditions.

In June of 1984, the College of Engineering published a notice to all engineering students regarding a change in the graduation requirements. (See Defendants' Exhibit E "NEW ENGINEERING GRADUATION REQUIREMENTS.") These new requirements required engineering students to maintain a 2.00 grade point average on all work attempted in the student's particular major together with the original requirement that a 2.00 cumulative grade point average on all courses attempted at Auburn be maintained. The change in the graduation requirements did not include additional course work or credit hours to be earned. The new graduation requirements were not to become effective, however, until one year later in the summer quarter of 1985. These changes in graduation requirements were widely circulated, and it is without dispute that the plaintiff was aware of the new requirements and that they would apply to him.[2] It appears that the plaintiff was at all times during his course of study at Auburn aware of his precarious academic position and that he would be subject to the new graduation requirements if he did not graduate by the summer quarter of 1985. (Plaintiff's deposition, pp. 53 and 64.) It is undisputed that by the summer quarter of 1984, when the new requirements were announced, that the plaintiff required only 33 hours of electrical engineering courses to become eligible for graduation. This situation would have required the plaintiff to pass on average only 8 or 9 hours in electrical engineer-

**2.** Not only were notices of the changes in graduation requirements widely circulated, but copies of the notices were distributed to the undergraduate counsellors who, in turn, advised the students concerning the changes in graduation requirements and the effective date of those changes. (Irwin deposition, p. 22.)

**1558**

ing courses per quarter and still graduate within the year's grace period before the new requirements went into effect. The plaintiff's failure to complete his course of study by the summer quarter of 1985 brought his academic deficiencies to the attention of Dr. Nick Conrad. (Irwin deposition, p. 10 & 11.) Dr. Conrad brought the plaintiff's academic situation to the attention of Professor David Irwin, head of the Electrical Engineering Department, because the plaintiff's 0.94 grade average was far below the 2.00 grade point average in the major course of study now required for him to graduate. Professor Irwin contacted four electrical engineering professors, several of whom were familiar with the plaintiff and his academic performance. (Irwin deposition, p. 19 & 20.) These professors reviewed the plaintiff's marks and academic record and recommended to Professor Irwin that the plaintiff be suspended from the College of Engineering. (Defendants' Exhibit F.) After receiving this recommendation, Professor Irwin contacted the Dean's Office for the College of Engineering and Dr. Conrad concerning the plaintiff's academic record. As a result of several discussions Professor Irwin had with other Auburn officials, and after reviewing the recommendation of the faculty members, Professor Irwin informed the plaintiff, on or about September 5, 1985, that the faculty had reviewed his work and found that it was unsatisfactory. Professor Irwin further informed the plaintiff that due to his unsatisfactory progress towards a degree in electrical engineering he would no longer be permitted to register for electrical engineering classes. (Defendants' Exhibit D.) Professor Irwin and his fellow faculty members' decision was made in reliance on the discretion afforded them under a procedure outlined in the Auburn University Bulletin which reads in pertinent part as follows:

Auburn University may place an undergraduate student on probation or suspension at any time if the student flagrantly neglects academic work or makes unsatisfactory progress towards graduation.

However, Professor Irwin exercised his discretion in such a manner that the plaintiff was suspended from taking any additional electrical engineering courses, but he was permitted to pursue any other curricula offered at Auburn.[3] On or about October 18, 1985, the plaintiff filed a formal written appeal to the Auburn Student Academic Grievance Committee. The Committee subsequently heard the plaintiff's case but agreed with the recommendation made by the Electrical Engineering faculty and Professor Irwin. The plaintiff then appealed to Dr. Brandt, Dr. Emert and President Martin, each of whom reviewed the plaintiff's marks and academic performance and concurred in the recommendation of the Student Academic Grievance Committee.

## II. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This Court has already dismissed the plaintiff's claims for damages against the defendants in their official capacities as being barred by the Eleventh Amendment. However, the Court granted leave to the plaintiff to amend his complaint so that the defendants could be added as parties in their individual capacities. (See this Court's Opinion filed January 28, 1987.) This Court now finds that the plaintiff has offered no evidence, by way of either affidavit or deposition, that any of the named defendants herein have committed any acts toward the plaintiff in their individual capacities which violated his rights to substantive due process, equal protection of the laws or breached any contractual rights that he had with Auburn. The only evidence before this Court concerns the conduct of the defendants in their official capacities as trustees of Auburn University and as officials and professors of Auburn University. Accordingly, this Court is of the opinion that the defendants' motions for summary judgment are due to be granted to the extent said defendants are sued in their individual capacities. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**3.** It is undisputed that the plaintiff was not dismissed as a student from Auburn University and could have pursued any other course of study.

This leaves for the Court's review, the plaintiff's prayer for prospective injunctive relief based upon the plaintiff's substantive due process, equal protection and contractual claims.

Rule 56(c), *Fed.R.Civ.P.*, provides that a summary judgment may be granted only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Accordingly, when considering a motion for summary judgment, the Court must refrain from deciding any material factual issues. Instead, the Court's sole function on a motion for summary judgment is to determine whether there exist issues of material fact to be tried and, if not, whether the moving party is entitled to a judgment as a matter of law. *See Dominick v. Dixie Nat. Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987); *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986); and *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir. 1980). Moreover, in performing this function, inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. In other words, all doubt as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Tippens v. Celotex Corp., supra;* and *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352 (11th Cir.1986).

■ As to the burden of proof on a motion for summary judgment, it is clear that the movant bears the exacting burden of showing both that there is no actual dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Combs v. King*, 764 F.2d 818 (11th Cir.1985). In clarifying the proper allocation of this burden, the United States Supreme Court has stated that:

> [W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury [could] properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (Citations omitted.)

\*    \*    \*    \*    \*    \*

> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden....The question is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.

\*    \*    \*    \*    \*    \*

> Our holding, ...[however] does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. (Citations omitted.) Neither do we suggest that the trial court should act other than with caution in granting summary judgment

or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. (Citations omitted.)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2512–14; 91 L.Ed. 2d 202, 214–16 (1986). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Having applied the above rules and principles of law to the instant motions for summary judgment and having considered all evidence offered in support of and in opposition to the same, this Court is of the opinion that no genuine issues of material fact exist herein and the defendants are entitled to a judgment as a matter of law on all counts remaining in the complaint and for the prospective injunctive relief prayed for by the plaintiff.

### III. DISCUSSION

■ The plaintiff claims that the defendants who comprise the Auburn University Board of Trustees have violated his constitutional rights by approving as the Board of Trustees the use of the 1985–1986 Auburn University Bulletin. The plaintiff admits that he did not present his case to the trustees. The plaintiff further admits that he knew of no intentional activity on the part of the trustees to prevent him from graduating. (Plaintiff's deposition, pp. 39, 40, 41 and 89.) This Court cannot find any evidence that the Auburn Board of Trustees took any action other than adopting the use of the 1985–86 Bulletin which incorporated the changes in the requirements for graduation for the College of Engineering. Absent a showing of some facts by the plaintiff demonstrating some action on the part of the individual members of the Board of Trustees, this Court is obliged to grant summary judgment for the defendant trustees because the plaintiff's complaint against them is without a factual basis. It is this Court's opinion that the act of approving the 1985–1986 Bulletin by the defendant trustees does not state a cause of action under § 1983. Not only does it fail to establish any personal activity on

the part of the defendants specifically toward the plaintiff, but the adoption of the Bulletin and the neutral change of academic policy contained therein is simply not a constitutional violation. The United States Supreme Court has held that federal courts are unsuited to review academic decisions. *Board of Curators University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). This Court finds specifically that the action taken by the Board of Trustees in adopting the 1985–86 Bulletin which contained the change of graduation requirements was a reasonable exercise of its educational responsibilities. *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir.1976).

### 1. *Standard of Review.*

Before this Court begins its discussion of the remaining issues in this case, it must decide by what standard it will evaluate the plaintiff's claims. It is obvious, no evidence having been submitted to the contrary, that the actions taken by the defendants toward the plaintiff were not disciplinary in nature. The plaintiff argues that the decision made by the defendants was one of policy implementation and, therefore, not an academic decision. The purport of this argument on the part of the plaintiff is to enlarge the standard of review to be employed by this Court in reviewing the plaintiff's claims. This Court is of the opinion that the plaintiff's argument is, at best, a distinction without a difference. The policy implemented by the Auburn University Board of Trustees was academic in nature and the decision by the officials at Auburn concerning the plaintiff was also academic in nature. The federal courts have adopted a very limited role in the review of challenges to academic decisions. The United States Supreme Court held in *Horowitz, supra*, 435 U.S. at 89–90, 98 S.Ct. at 954–55:

If a "Federal Court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," *Bishop v. Wood*, 426 U.S. [341] at 349, 48 L.Ed. 2d 684, 96 S.Ct. 2074 [at 2079–80 (1976)], far less is it suited to evaluate the sub-

stance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require "an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decision making."

This language supports the Court's theory in *Horowitz, supra,* that the widest possible range of discretion must be afforded university faculties in their evaluation of a student's academic performance and eligibility to promotion or graduation. Clearly, this Court can only review an academic decision in light of whether or not the "person or committee responsible did not actually exercise professional judgment." *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).

### 2. *Substantive Due Process.*

■ The narrow standard of review defined in *Ewing* has been adopted in reviewing substantive due process claims by the United States Court of Appeals for the Eleventh Circuit. In *Haberle v. University of Alabama at Birmingham,* 803 F.2d 1536 (11th Cir.1986), the Court held:

> "*Ewing* makes it plain, in absence of an improper motive, an academic dismissal must be 'such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment' before it will be overturned on substantive due process grounds." *Haberle, supra,* at 1540.

The United States Court of Appeals for the Eighth Circuit has likewise adopted a narrow standard not unlike the Eleventh Circuit in *Haberle, supra.* In *Schuler v. University of Minnesota,* 788 F.2d 510 (8th Cir.1986), the Eighth Circuit adopted an arbitrary and capricious standard requiring a student to show a lack of a rational basis in an academic dismissal or that the University was motivated by bad faith or malice "unrelated to academic performance." *Schuler, supra,* at 515.

In reviewing the plaintiff's substantive due process claim, this Court must express the same doubts as Justice Powell in *Ewing, supra,* as to whether or not the plaintiff can even demonstrate a constitutionally protected property or liberty interest in his post-secondary education. But following the United States Supreme Court's lead as well as that of the Eleventh Circuit Court of Appeals, this Court assumes, *arguendo,* for purposes of this opinion, that a constitutional right is implicated. In light of the standards adopted by this circuit and by the United States Supreme Court in *Ewing, supra,* this Court cannot reach the conclusion that the plaintiff was treated in a manner which was ·completely devoid of reasoned academic decisionmaking. Rather, this Court, after considering the undisputed evidence before it, must conclude that the defendants gave the plaintiff notice of the change in graduation requirements and a reasonable and generous amount of time in which to become eligible for a degree under the old requirements. Upon the plaintiff's failure to complete the remaining 33 hours of the electrical engineering courses within the year's grace period, the College of Engineering elected to close the electrical engineering curriculum to the plaintiff because he was making unsatisfactory progress towards his degree. However, the plaintiff was not dismissed as a student from Auburn University, but rather, only one avenue was closed to him based solely on his academic record. This Court is of the opinion that the plaintiff was treated in a fair and reasonable manner. The plaintiff has not offered any basis for this Court to doubt the motives of the defendants and substantial evidence has been offered that the defendants treated the plaintiff according to a set policy in light of his academic performance. Having taken the aforementioned into consideration, this Court is of the opinion that the plaintiff's substantive due process claim is without merit.

### 3. *The Contract Theory.*

■ The plaintiff puts forth another argument advancing a theory that he had a contract with Auburn University based upon the '82 Bulletin and that the change

in the degree requirements as they applied to him amounted to a breach of contract.

Without finding specifically that the plaintiff had a binding contract with Auburn, this Court will assume, *arguendo,* that some sort of educational contract existed. In discussing the plaintiff's breach of contract claim, it should be noted that the '82 Bulletin contained the following caveat:

> The University reserves the right to make changes as required in course offerings, curricula, academic policies and other rules and regulations affecting students, to be effective whenever determined by the University. These changes will govern current and formerly enrolled students. Enrollment of all students is subject to these conditions.

The law in this circuit is clear regarding breach of contract claims similar to the plaintiff's herein. Implicit in a student's educational contract with the University is the duty of the student to comply with the University's rules and regulations which the University can modify "so as to properly exercise its educational responsibilities." *Mahavongsanan, supra,* at 450. The facts in *Mahavongsanan, supra,* are instructive for the purposes of this discussion because they closely resemble the facts of the instant case. There the plaintiff was a student who brought suit against Georgia State University in an attempt to compel it to award her a degree. The plaintiff alleged that Georgia State University breached its contract with her by requiring her to take a comprehensive examination to graduate, which was not a requirement when she enrolled. The plaintiff received ample notice of the change in the requirements to graduate, and the Fifth Circuit Court of Appeals found the change to be a proper exercise of the University's educational responsibilities. A similar result was reached concerning the changing of degree requirements in *Easley v. University of Michigan Board of Regents,* 627 F.Supp. 580 (E.D.Mich.1986). In *Easley,* the University of Michigan Law School changed the number of hours to graduate after the plaintiff enrolled. The plaintiff claimed in his suit that he was not bound by the change in hours to graduate, but the district court rejected his argument. The Court in *Easley* found that the University had an inherent right to modify degree requirements and that the bulletin relied upon by the plaintiff contained language specifically stating the information in the bulletin was subject to change.

In the instant case, the record demonstrates that Auburn University specifically reserved the right to modify its graduation requirements and gave the plaintiff notice of the changes when they were made. In addition, Auburn allowed all students in the same situation as the plaintiff one year in which to graduate under the terms of the '82 Bulletin. Accordingly, it is the opinion of this Court that the plaintiff's breach of contract claim is completely without merit.

### 4. *Equal Protection Claim.*

The plaintiff makes a claim that the defendants violated his right to equal protection of the laws. The plaintiff's theory is based upon his assertion that other state universities in Alabama have degree requirements which would have permitted him to take a degree in electrical engineering. In support of his argument, the plaintiff has offered the Court the general degree requirements of other state universities in Alabama and his affidavit stating the degree requirements are different among several of the universities. This Court is of the opinion that this evidence is irrelevant. It appears that other students in the plaintiff's academic situation at Auburn either overcame their disabilities within the one year grace period and became eligible for their degree or opted to pursue some other course of study. (Flynn's deposition, p. 41, Defendants' Exhibit "D.") The plaintiff has offered no other evidence of students within the College of Engineering who, in the same or similar position, were treated any differently from the plaintiff. In fact, the Court finds that to the extent there is any evidence concerning the treatment of other students, such evidence is squarely against the plaintiff. The plaintiff argues that the College of Education at Auburn may change its re-

quirements but will not allow this change to affect already enrolled students in that college. Whether this change is contemplated or presently in effect is not clearly established, but it appears to be equally irrelevant. The Dean of the College of Education testified at his deposition that each college at Auburn was free to make its own proposals for degree requirements to the University (p. 19 Blackburn deposition).

 The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally. *See, Ross v. Moffitt,* 417 U.S. 600, 612, 94 S.Ct. 2437, 2444–45, 41 L.Ed.2d 341 (1974). To the extent that any equal protection analysis is required here, absent the plaintiff's establishing a clearly protected liberty or property interest by the Constitution in his post-secondary education, this Court would look to see if persons similarly situated to the plaintiff have been treated differently. As has been discussed previously herein, there is *no* evidence that any electrical engineering students in the same position as the plaintiff have been treated differently from the plaintiff. The facts before the Court clearly demonstrate that those students who were in the plaintiff's position within the College of Engineering either graduated before the effective date of the new requirements or chose a new discipline. *See, Watson v. Univ. of So. Ala. College of Medicine,* 463 F.Supp. 720 (S.D.Ala.1979). The plaintiff has offered the Court nothing on which to base his equal protection claim. Accordingly, it is the opinion of this Court that the plaintiff's equal protection claim is without merit.

### 5. *Miscellaneous Issue.*

 Finally, the plaintiff argues that he should be given credit for electrical engineering courses taken by him at Tuskegee University and Auburn University at Montgomery after he was forbidden to register for electrical engineering courses at Auburn. This argument is without merit. The plaintiff knows or ought to know that the '82 Bulletin and the 1985–86 Bulletin

require that the plaintiff's final 45 hours for his degree be earned in residence at Auburn. The plaintiff has offered no evidence that this requirement was waived by the Dean of the College of Engineering. In fact, the facts before the Court clearly demonstrate that no such waiver has ever been offered the plaintiff. (Plaintiff's deposition, p. 85.)

In conclusion, it is the opinion of this Court that the defendants' motions for summary judgment are due to be granted in all respects and that the complaint as amended in this cause is due to be dismissed with prejudice.