**Therese B. REILLY, Appellant–Plaintiff,**

v.

**Walter J. DALY, et al., Appellees–Defendants.**

No. 49A05–9509–CV–354.

Court of Appeals of Indiana.

June 7, 1996.

Transfer Denied Nov. 13, 1996.

**4.** See *Herrell v. Casey* (1993) Ind.App., 609 N.E.2d 1145; *Krieger v. Ownership Corp.* (1959) 3rd Cir., 270 F.2d 265, *reh'g denied.*

Ronald E. Elberger, George T. Patton, Jr., William C. Ahrbecker, Bose McKinney & Evans, Indianapolis, for Appellant.

David M. Mattingly, David J. Mallon, Jr., Tara L. Schulstad, Ice Miller Donadio & Ryan, Indianapolis, for Appellee.

**OPINION**

RUCKER, Judge.

Plaintiff–Appellant Therese Reilly appeals the trial court's order denying her request for preliminary injunction against Defendants–Appellees Indiana University School of Medicine, Walter Daly, dean of the School, Professors Lynn Willis and Joseph DiMicco, and members of the Student Promotions Committee. Reilly raises several issues for our review which we rephrase as whether the trial court abused its discretion in denying the injunction. We affirm.

In 1991, Therese Reilly began a course of study at the Indiana University Medical School. In the fall of her second year at the school, Reilly enrolled in a Medical Pharmacology course directed by Professors Lynn Willis and Joseph DiMicco. On December 19, 1994, Reilly sat for the final examination in the course. During the exam, Professors Willis and DiMicco noticed that Reilly was acting in an unusual and suspicious manner. Reilly held her test paper up in the air, looked around the room, and wrote her exam on her left thigh positioning herself in such a way that she was turned toward another student seated just two seats away. The professors believed that Reilly was copying or attempting to copy from the other student's paper. Approximately halfway through the exam, the other student got up to ask Professor Willis a question. At that time, Professor Willis requested that the student cover his paper more completely.

Professors Willis and DiMicco had taught Pharmacology at the medical school for ap-

proximately twenty-two and fifteen years respectively and were quite familiar with the behavioral manifestations of cheating. The professors indicated that cheating behavior, while not easy to verbalize, is so distinct that it is immediately recognizable. Reilly's behavior stopped when the neighboring student left the test room.

At the conclusion of the exam period, the professors held the exam papers of Reilly and the neighboring student in order to determine whether their answers matched. A comparison of the exams revealed that the first seven pages, which included twenty-seven multiple choice and matching questions, were identical. The perfect match abruptly ended halfway through the exam, approximately the time when the neighboring student was warned to cover his paper.

Taking the conservative approach of comparing only wrong answers on only the multiple choice questions, the professors were advised by a statistician that there was a one in 200,000 probability that such a match of wrong answers on the multiple choice questions would occur by chance. The exact match on the first half of the exam along with the statistical analysis of wrong answers combined with the behavior that originally drew the professors' attention to Reilly convinced them that Reilly had indeed cheated on the exam.

The professors sent an evaluation form to Reilly notifying her that they had assigned her a grade of "F" in the course because they determined that she had cheated on the final exam. The evaluation form set forth the behavior they perceived as suspicious, as well as their statistical comparisons. Reilly protested her grade by way of a January 10, 1995, letter to the professors, after which the professors reaffirmed their decision, fully setting forth their reasons for so doing.

On January 17, 1995, an informal conference was conducted at which Reilly and her counsel questioned the professors and presented Reilly's position. At the conference, Reilly admitted the behavior described by the professors but explained that it was the result of too much coffee and too little sleep.

She presented her medical school grades in order to demonstrate that she was a good student who did not need to cheat. Reilly also presented her own statistical analysis of the exam and brought to the professors' attention the possibility of "lure" questions on the exam which would heighten the probability of the match occurring by chance. The professors thereafter obtained a new statistical analysis taking into account "lure" questions on the exam. This analysis demonstrated a one in 500 to one in 5000 probability of the match occurring by chance. On January 27, 1995, the professors wrote to Reilly, reaffirming their position that she had cheated and explaining the reasons why the evidence she presented did not produce a different result. Reilly appealed this decision to the Chairman of the Department of Pharmacology and Toxicology who declined to provide her relief.

On February 23, 1995, the School notified Reilly of a hearing before the Student Promotions Committee to appeal her grade and to show cause why she should not be dismissed for failure to maintain minimal academic standards. Medical School policy dictates that once a student has received two "Fs" in his or her medical school record, the Committee will review the student's academic standing. Two "Fs" in the record is grounds for automatic dismissal from the School.

At the Committee hearing, conducted March 13, 1995, Reilly was assisted by counsel and was given the opportunity to fully present her version of the facts. Pursuant to university policy, Professors Willis and DiMicco were not present at the hearing. However, the transcript of the informal conference between Reilly and the professors as well as all documents and letters exchanged prior to the hearing were presented to the Committee for its consideration.

After considering all the evidence, the Committee voted to recommend that Reilly be dismissed from the School of Medicine because she had received two grades of "F" in her medical school career.[1] Reilly appeal-

1. The first grade of "F" occurred two years earlier when Reilly admitted to cheating on the final

exam in her Neurobiology course. In that instance, the Committee at first voted to recom-

ed the decision back to the Committee which then voted to affirm its recommendation of dismissal. On June 13, 1995, the dean of the School adopted the Committee's recommendation and dismissed Reilly from the School.

That same day, Reilly filed a complaint against the Indiana University School of Medicine, Walter Daly, dean of the School, Professors Lynn Willis and Joseph DiMicco, and members of the Student Promotions Committee (collectively "the School") alleging various constitutional violations and requesting a temporary restraining order, preliminary injunction and permanent injunction against enforcement of the School's decision. The trial court granted a temporary restraining order but thereafter denied the request for preliminary injunction. This interlocutory appeal ensued.

### STANDARD OF REVIEW

■ The grant or denial of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. *Amoco Production Co. v. Laird,* 622 N.E.2d 912 (Ind.1993). The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. *T.H. Landfill Co., Inc. v. Miami County Solid Waste Dist.,* 628 N.E.2d 1237 (Ind.Ct.App. 1994).

■ The trial court's discretion to grant or deny preliminary injunctive relief is measured by several factors: 1) whether the plaintiff's remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; 2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; 3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and 4) whether, by the grant of the preliminary

injunction, the public interest would be disserved. *Xantech Corp. v. Ramco Industries, Inc.,* 643 N.E.2d 918, 921 (Ind.Ct.App.1994). The party seeking an injunction has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle the party to injunctive relief. *Steenhoven v. College Life Ins. Co. of America,* 458 N.E.2d 661, 668 n. 20 (Ind.Ct.App.1984), *reh'g denied,* 460 N.E.2d 973 (Ind.Ct.App. 1984).

### DISCUSSION

Reilly contends the trial court abused its discretion in denying her request for preliminary injunction because each of the elements required for issuance of an injunction was established by a preponderance of the evidence. Although Reilly addresses each of the elements in turn, we address only her claim that she established a reasonable likelihood of success at trial because that issue is dispositive.

In support of her claim, Reilly asserts that the proceedings before the Committee did not comport with the requirements of due process and equal protection and that the Committee's decision was arbitrary and capricious because it is unsupported by substantial evidence.

### DUE PROCESS

Reilly's due process claim is based on the Fourteenth Amendment to the United States Constitution and on Article I, § 12 of the Indiana Constitution. According to Reilly, the School violated her right to due process by: (1) denying her the opportunity to question Professors Willis and DiMicco before the Student Promotions Committee, (2) charging her with violating a rule which prohibits the appearance of cheating, an allegedly vague and overbroad standard, and (3) failing to judge her by the clear and convincing standard of proof.

■ The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of

---

mend Reilly's dismissal from the School of Medicine but on appeal reversed that decision and

recommended a one-year suspension.

law. U.S. Const. amend. XIV, § 1. Indiana Const. art. I, § 12 contains a similar provision and has been construed by our courts as analogous to the federal due process clause. *Haimbaugh Landscaping, Inc. v. Jegen,* 653 N.E.2d 95, 104 (Ind.Ct.App.1995) *trans. denied; Wilhoite v. Melvin Simon & Associates, Inc.,* 640 N.E.2d 382, 387 (Ind.Ct.App. 1994). It is without question that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property and that a student facing expulsion or suspension from a public educational institution is therefore entitled to the protections of due process. *Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988); *Jaksa v. Regents of the Univ. of Michigan,* 597 F.Supp. 1245, 1247–48 (E.D.Mich.1984).

■ The due process required in a school suspension or dismissal proceeding is dependent upon whether the hearing is academic or disciplinary. In the case of an academic dismissal, due process requires only the barest procedural protections. *Jaksa,* 597 F.Supp. at 1248 n. 2; *Neel v. Indiana .Univ. Bd. of Trustees,* 435 N.E.2d 607, 613 (Ind.Ct. App.1982).

■ Where a dismissal is for disciplinary reasons, the fundamental requirements of due process are notice and opportunity for a hearing appropriate to the nature of the case. *Bleicker v. Bd. of Trustees of the Ohio State Univ., College of Veterinary Medicine,* 485 F.Supp. 1381, 1386 (S.D.Ohio 1980). The hearing, to be fair in the due process sense, implies that the person adversely affected was afforded the opportunity to respond, explain, and defend. *Gorman,* 837 F.2d at 13. Due process does not guarantee any particular form of procedure; it is only intended to protect substantial rights. *Hill v. Trustees of Indiana Univ.,* 537 F.2d 248, 252 (7th Cir.1976).

■ Courts have refused to require the traditional formalities of legal proceedings in school suspension and dismissal hearings. *Nash v. Auburn Univ.,* 812 F.2d 655, 664 (11th Cir.1987). A full hearing "with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impracti-

cal to carry out." *Dixon v. Alabama State Bd. of Education,* 294 F.2d 150, 158–59 (5th Cir.1961), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). To further escalate the formality and adversity of the suspension process "may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as a part of the teaching process." *Goss v. Lopez,* 419 U.S. 565, 583, 95 S.Ct. 729, 741, 42 L.Ed.2d 725 (1975). Due process thus requires not an elaborate hearing before a neutral party, but simply " 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.' " *Gorman,* 837 F.2d at 16 citing *Ingraham v. Wright,* 430 U.S. 651, 693, 97 S.Ct. 1401, 1423, 51 L.Ed.2d 711 (1977) (White, J., dissenting).

■ Here, whether Reilly's dismissal is characterized as academic or disciplinary, none of the alleged deficiencies raised by Reilly amount to a denial of due process. First, the federal courts have consistently held that where basic fairness is preserved a student subject to dismissal for disciplinary reasons is not entitled to formal cross-examination of her accusers. *Nash v. Auburn Univ.,* 812 F.2d 655, 664 (11th Cir.1987); *Boykins v. Fairfield Bd. of Education,* 492 F.2d 697, 701–02 (5th Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438; *Winnick v. Manning,* 460 F.2d 545, 549 (2d Cir.1972); *Dixon v. Alabama State Bd. of Education,* 294 F.2d 150, 158–59 (5th Cir. 1961), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193; *Jaksa v. Regents of the Univ. of Michigan,* 597 F.Supp. 1245, 1252 (E.D.Mich.1984).

In the few instances where some right to cross-examination has been recognized, the courts have not required the formalities mandated in criminal or civil proceedings. For instance, in *Morale v. Grigel,* 422 F.Supp. 988, 995, 1004 (D.C.N.H.1976), the court found that due process was satisfied where a student was allowed to call witnesses and cross-examine them subject to the qualification that the witnesses did not have to answer any questions and were not under oath. Also, in *Nash.,* 812 F.2d at 664, where students were allowed to pose questions of the accusing witnesses by directing their questions to the chancellor who would then direct

the questions to the witnesses, due process was satisfied despite the students' inability to question the witnesses in the usual adversarial manner. *See also Gorman v. Univ. of Rhode Island,* 646 F.Supp. 799, 807 (D.R.I. 1986) (courts have allowed at most a very limited right to cross-examination in school disciplinary hearings); *cf. Winnick,* 460 F.2d at 550 (if case had resolved itself into problem of credibility, cross-examination of witnesses might have been essential to a fair hearing); *Dillon v. Pulaski County Special School District,* 468 F.Supp. 54, 58 (E.D.Ark. 1978), *aff'd,* 594 F.2d 699 (8th Cir.1979) (cross-examination of accusing teacher required where only evidence supporting expulsion was written recommendation containing teacher's accusations). Rather than formal procedures, all that is required is that the student have an opportunity to elicit the truth about the facts and events at issue. *Gorman,* 837 F.2d at 16; *Dixon,* 294 F.2d at 159.

The record reveals that despite not being able to question Professors Willis and DiMicco before the Committee, Reilly was fully apprised of the evidence against her and had an opportunity to present her side of the story prior to the Committee's decision. The evaluation form sent to Reilly after the exam completely set forth the professors' reasons for believing Reilly had cheated on the exam, and subsequent correspondence between the parties disclosed all the evidence for and against Reilly. In addition, the informal conference held January 17, 1995, afforded Reilly the opportunity to confront the professors and explain her side of the story. The transcript of the informal conference along with all documents in the case were presented to the Committee, and Reilly was able to fully present her position to the Committee at the time of the hearing. These procedures afforded Reilly at least the minimum due process required by the Fourteenth Amendment and Ind. Const. art. I, § 12.

 Reilly's claim that the university rule she was charged with violating is unconstitutionally vague because it references the "appearance of cheating" is likewise unavailing. The record is clear that the Commit-

tee's decision to dismiss Reilly from the School of Medicine was not based on the appearance of cheating but rather on the determination that Reilly actually had cheated on the exam. According to Professor Willis and members of the Committee, the appearance of cheating was considered only to the extent that Reilly's actions during the exam aroused suspicion and led to further investigation. Thus, whether or not a university rule prohibiting the appearance of cheating is sufficiently specific to comport with due process, no constitutional violation occurred in this case.

 Finally, Reilly's claim that she was entitled to be judged by the clear and convincing standard of proof is contrary to prevailing authority. The law is well established that due process requires only that universities and colleges base their suspension or dismissal decisions on substantial evidence. *Gorman v. Univ. of Rhode Island,* 646 F.Supp. 799, 813 (D.R.I.1986); *Slaughter v. Brigham Young University,* 514 F.2d 622, 625 (10th Cir.1975), *cert. denied,* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131; *Givens v. Poe,* 346 F.Supp. 202, 209 (W.D.N.C.1972); *Scoggin v. Lincoln Univ.,* 291 F.Supp. 161, 171 (W.D.Mo.1968). The record amply supports the Committee's adherence to this burden.

### EQUAL PROTECTION

 Reilly also claims that she was denied the right to equal protection because certain rights are afforded to undergraduate and law students at the University but not to medical students. Specifically, Reilly claims that undergraduate and law students may cross-examine witnesses during disciplinary proceedings, are not subject to a rule prohibiting the appearance of cheating, and can be disciplined only if the charges against them are established by clear and convincing evidence.[2]

 The Equal Protection Clause of the Fourteenth Amendment prohibits states from distributing benefits unequally to individuals who are similarly situated. *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). The Equal Protection

---

2. Reilly also claims that the School's failure to provide benefits equally to medical students, un-

dergraduate students, and law students violates Ind. Const. art. I, § 23 which provides in perti-

Clause does not require that all persons be treated either identically or equally. *Hammond v. Auburn Univ.*, 669 F.Supp. 1555, 1563 (M.D.Ala.1987). Rather, equal protection analysis is implicated only if an individual has been treated differently from similarly situated persons. *Id.*

In *Hammond*, 669 F.Supp. at 1563, the plaintiff, a student at Auburn University's College of Engineering, brought suit against the University after he was dismissed for failing to satisfy graduation requirements which had been modified after his enrollment in the college. The plaintiff contended that the revised graduation requirements violated equal protection because they were more stringent than those at other universities and because the College of Education at Auburn University did not apply changes in graduation requirements to already-enrolled students. The court rejected this argument, holding instead that the plaintiff was similarly situated to other electrical engineering students at Auburn University. In support of its ruling, the court noted that each college at Auburn University was free to draft its own proposals for degree requirements. *Id.* at 1562–63.

Like the plaintiff in *Hammond*, Reilly is not similarly situated to Indiana University undergraduate and law students. She is enrolled in a wholly distinct educational forum, and is subject to entirely different academic and educational standards, requirements, expectations, and challenges. Further, as in *Hammond*, each school at Indiana University is permitted to adopt its own procedures for suspensions and dismissals, consistent with its individual needs and policies. Thus, the failure of the Medical School to adopt policies similar to those applied to undergraduate and law students does not violate equal protection.

### *SUBSTANTIAL EVIDENCE*

 Reilly next contends the School lacked substantial evidence that she cheated

nent part: "The General Assembly shall not grant any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Reilly correctly points out that this provision is not identical with the federal equal protection clause, and she proceeds to set forth the standard governing

on the Pharmacology final examination and its decision to expel her was therefore arbitrary and capricious. According to Reilly, the observations by Professors Willis and DiMicco and the statistical evidence presented to the Committee demonstrate only a suspicion or mere possibility of cheating and are insufficient to sustain the School's decision.

Although due process requires schools and colleges to base their suspension and dismissal decisions on substantial evidence, the standard of review on appeal is whether there is some evidence to support the decision of the school or college disciplinary board. *McDonald v. Bd. of Trustees of the Univ. of Illinois*, 375 F.Supp. 95 (N.D.Ill. 1974), *aff'd*, 503 F.2d 105 (7th Cir.1974); *Gorman v. Univ. of Rhode Island*, 646 F.Supp. 799, 807 (D.R.I.1986).

The professors' observations of cheating behavior by Reilly combined with the statistical analysis of the test results constitutes at least some evidence in support of the Committee's conclusion that Reilly cheated on her final exam. Because the Committee's determination is supported by the evidence, we cannot conclude that the decision to expel Reilly was arbitrary or capricious.

### *CONCLUSION*

Because Reilly has failed to establish a reasonable likelihood of success at trial on any of the claims alleged in her complaint, the trial court was within its discretion in denying preliminary injunctive relief.

Judgment affirmed.

SHARPNACK, C.J., and DARDEN, J., concur.

actions arising under the Indiana provision. *See Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994). However, aside from acknowledging the standard, Reilly makes no argument on the issue independent of her analysis under the federal equal protection clause. We therefore decline to address the issue.