**Jay C. GAGNE, Appellant–Plaintiff,**

v.

**The TRUSTEES OF INDIANA UNIVERSITY and Norman Lefstein, Individually and in his Official Capacity as Dean of Indiana University School of Law–Indianapolis, Appellees–Defendants.**

No. 49A04–9701–CV–31.

Court of Appeals of Indiana.

March 2, 1998.

J. Richard Kiefer, Thomas D. Collignon, Kiefer & McGoff, Indianapolis, for Appellant–Plaintiff.

Cory Brundage, Judy S. Okenfuss, Ice Miller Donadio & Ryan, Indianapolis, for Appellees–Defendants.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Jay C. Gagne appeals the judgment entered after a bench trial for The Trustees of Indiana University and Norman Lefstein, individually, and in his official capacity as Dean of Indiana University School of Law–Indianapolis (collectively "the Law School") on Gagne's complaint. We affirm.

### ISSUES

1. Whether the trial court erred in holding that the procedure whereby Gagne was expelled from the Law School did not violate his right to due process.

2. Whether the trial court erred in holding that the Law School did not breach its contractual relationship with Gagne.

### FACTS

Gagne submitted an application dated January 2, 1993, to the Law School. The application asked whether the applicant had "ever been arrested or convicted of any criminal offense other than a minor traffic violation" or had "any criminal charges pending." (R. 1176). Gagne responded, "No." *Id.* Gagne did not attend the Law School during the '93–'94 term but rather enrolled at John Marshall Law School. Gagne applied again for admission to the Law School with an application dated May 1, 1994. He was again asked the above question and again answered, "No." (R. 1212). Gagne began attending the Law School as a transfer student in late August for the Fall 1994 term. In mid-September, Dean of Students Rachel Kearney learned that on both applications to the Law School Gagne had misrepresented his history in his negative answers to the question regarding arrests or convictions.

The first week of September, Gagne delivered copies of his resume to the Law School's Career Services Office for submission to law firms interviewing students for prospective employment. Under the title "Education," Gagne's resume reported the following:

**Indiana University School of Law** Indianapolis, IN, pending Juris Doctorate, with intended focuses in tort, criminal, and constitutional law, expected graduation June 1996. **GPA 3.7 (top 3%)** and **Class Rank 7/250.**

(R. 1226) (emphasis in original). No mention of John Marshall appears in the Education section; nor was his transfer status or the fact that his entire 24 credit hours of law school education had taken place there mentioned. A number of law firms scheduled interviews with Gagne through the Career Services Office. One law firm contacted the Law School after an interview with Gagne to notify the school that Gagne had failed to disclose on his resume that he was a transfer student.

On September 27th, the Career Services Office—which Dean Kearney supervised—

brought to her attention Gagne's resume. Kearney immediately realized that not only did the resume fail to mention John Marshall, but the grade point average and class rank differed from that shown on his transcript. Kearney met with Gagne the next day and explained to him how the information on his resume was misleading. On September 30th, she directed a memorandum to Gagne to stress the seriousness of the matter, specifying the reasons the resume information was "not correct" as follows: his failure to reveal that he completed his first year of law school at another school; that he had no GPA or class rank at the Law School; and that his transcript from John Marshall reflected a GPA of 3.187 and a class rank of 40/240. (R. 1358). The memorandum stressed the need for his "resume to be truthful and accurate," and told him to contact all potential employers in writing to correct the discrepancies.

On October 27, 1994, Dean Kearney initiated disciplinary action against Gagne under the provisions of the Code of Student Ethics dealing with student misconduct. Kearney notified Gagne that he was charged with having committed three "personal misconduct" violations of the Code prohibition of any "[f]alse statement or concealment of information material to admission to law school, application for admission to the bar, or application for employment." (R. 1073). The first violation arose from Gagne's failure to disclose on his first application to the Law School his arrest for disorderly conduct and his then pending charges for reckless driving. The second violation arose from his failure to disclose on his second application either the disorderly conduct arrest or his conviction for reckless driving so as to endanger others, for which he had served five days in jail. The third violation concerned Gagne's false statements on his resume regarding his grade point average and class rank, and his failure to disclose his transfer status.[1] The notice informed Gagne that as

Dean of Students, she would conduct an informal conference with him "to discuss the alleged violations," (R. 1074), that he could bring an advisor, and that any disciplinary penalties she imposed could be appealed.

On November 4, 1994, Dean Kearney held the informal conference with Gagne and his legal counsel, Cliff Courtney. The conference lasted for over an hour. Gagne responded to each of the alleged violations. Gagne told Kearney that he did not report the disorderly conduct matter on either the first or the second application because he had later been acquitted of the charge and did not realize the application asked for information regarding an arrest which was not followed by a conviction. Gagne said that he failed to report the reckless driving charge of September 1992 because until nine days after the first application was signed he did not realize that he had been charged with a misdemeanor; and when he completed his second application he simply copied the first and failed to realize that he should report his subsequent misdemeanor conviction.[2] With respect to the resume, Gagne explained that he only reported his GPA and rank from his first 9-hour term at John Marshall[3] because he believed one grade he received in his second 15-hour term was erroneous. With respect to each of the alleged violations, Gagne reported being rushed for time when he prepared the document. By letter dated November 9, 1994, Dean Kearney notified Gagne that she was imposing the sanction of expulsion because Gagne's "careless disregard for accuracy," "high degree of blindness to ethical concerns," and "three separate violations of the Code" demonstrated "a pattern of conduct" warranting expulsion. (R. 1066). The notice informed Gagne of his right to appeal to the Dean of the Law School.

Gagne appealed to Dean Lefstein, Dean of the Law School. In discussions with Gagne's attorney, Courtney, about the appeal hearing, Dean Lefstein essentially told Courtney, "[I]t will be your show, bring whomever you

---

1. The specific deficiencies were described exactly as in the memorandum to him in that regard from Dean Kearney on September 30, 1994.

2. The conviction was on June 10, 1993; Gagne signed the second application on May 1, 1994.

3. According to Dean Kearney's memorandum to Gagne, his transcript indicated a GPA of 3.666 after the first semester.

like, we'll accept whatever you bring." (R. 2008). The hearing before Dean Lefstein was held on November 28, 1994, and lasted more than two hours. Dean Lefstein first reviewed the charges. Then Courtney made an opening statement. Witnesses were presented on Gagne's behalf. Gagne spoke at length, again explaining his reasons for the statements on his applications and resume. As Courtney put it, the hearing "was primarily [Gagne] and the documents." (R. 2010). Courtney presented a closing statement.

At the conclusion of the hearing, there being no dispute about Gagne's having made the challenged statements on the applications and resume, Dean Lefstein "was prepared to expel the student," (R. 1889), and "was going to expel him unless [he] could find evidence in mitigation ... that would justify mitigating that sanction." (R. 1815). Therefore, Dean Lefstein sought "facts that could be documented" to support Gagne's assertions about his justifications for his action. (R. 1816). Lefstein made or caused to be made several telephone calls to check whether John Marshall considered there to be a dispute about one of Gagne's grades, whether Gagne was taken into custody following the disorderly conduct arrest, and whether Gagne had told the law firms of his transfer status and the specifics of his claimed GPA and class rank. When Dean Lefstein "couldn't find those facts," he notified Courtney on December 1, 1994, that he was sustaining Dean Kearney's decision to expel Gagne. (R. 1816).

When notified of Dean Lefstein's decision, Gagne sought the appointment of a Review Board pursuant to the Code of Student Ethics applicable to the Law School. The Code provides that after the Dean of Students has imposed a sanction on a student, that decision may be appealed to the Dean of the Law School. The Code further provides as follows:

> In resolving the appeal, the Dean ... may sustain, reverse or modify any decision of the Dean of Students....

> If the appeal is not resolved, the Dean of the school must submit the appeal to a review board for consideration.

(R. 1084). Dean Lefstein advised Gagne that he had no right to a review board because Lefstein had resolved the matter, and, therefore, his decision was final.

On December 8, 1994, Gagne filed a complaint seeking a temporary restraining order and preliminary injunction. When these were denied, he amended his complaint to seek judicial review of the Law School's action on due process and breach of contract grounds. The matter was tried to the bench over the course of three days. The trial court entered extensive findings of fact and conclusions of law, and entered judgment for the Law School.

## DECISION

■ Gagne appeals a negative judgment. Therefore, to prevail on his appeal he must establish that the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to but one conclusion, yet the trial court reached a different conclusion. *Estate of McClenahan v. Biberstein,* 671 N.E.2d 482, 485 (Ind.Ct.App.1996).

### 1. *Due Process*

■ As we explained in *Reilly v. Daly,* 666 N.E.2d 439, 444 (Ind.App.1996), *trans. denied,* a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process. When a sanction is imposed for disciplinary reasons, the fundamental requirements of due process are notice and an opportunity for a hearing appropriate to the nature of the case. *Id.* In order to be fair in the due process sense, the hearing must afford the person adversely affected the opportunity to respond, explain, and defend. *Id.* For school expulsion, due process requires an informal give-and-take between the student and the disciplinarian, where the student is given an opportunity to explain his version of the facts. *Id.* Due process further requires that a university base an expulsion on substantial evidence. *Id.* at 445.

■ Gagne first claims that *ex parte* communications by Dean Lefstein and his

staff after the November 28, 1994, hearing violated his due process rights. He cites *Doran v. Board of Educ. of Western Boone County Community Schools*, 152 Ind.App. 250, 283 N.E.2d 385 (1972), as holding "that the school board's receipt of information outside the hearing concerning a teacher's employment violated due process" required a reversal of the board's decision to terminate the teacher's employment. Gagne's Brief at 17. We do not find *Doran* apposite to the case before us. First, the termination decision in *Doran* was made by the Board of Education, "charged with the same legal procedure of accepting or rejecting evidence as a state wide administrative body." 283 N.E.2d at 387. As we said in *Reilly*, when the context is expulsion from school, a "full hearing" or "elaborate hearing before a neutral party" is not required by due process. 666 N.E.2d at 444. Moreover, *Doran* considered whether the procedure used by the School Board was "a hearing within the terms and conditions of [the teacher's] *contract*." 283 N.E.2d at 385 (emphasis added). Consequently, we agree with the Law School's contention that *Doran* simply does not apply to due process in the university student discipline context.

Further, as the Law School observes, "it was not the fact of contacts outside of the hearing which violated due process in *Doran* but the fact that the decision on the crucial issue was made in reliance on those contacts." Law School's Brief at 17. *Doran* cited testimony of a Board member that he relied on information given to him prior to the hearing in making his decision to terminate the teacher. Our supreme court found it "apparent, ... that the Board considered evidence not brought out at the hearing in deciding to terminate [the teacher's] employment." 283 N.E.2d at 389. And on rehearing, the court emphasized that evidence gathered prior to the board's hearing "must not be relied upon by them or considered by them in arriving at their decision," but rather the board "must rely only on the evidence presented at the hearing." *Doran v. Board of Ed. of Western Boone County Community Schools*, 152 Ind.App. 250, 285 N.E.2d 825, 829 (1972).

Here, the trial court found as follows:

> On the basis of the evidence presented at the hearing, Dean Lefstein concluded that [Gagne] had committed the misconduct alleged. Further, based upon the evidence, or lack thereof, to mitigate the sanction presented at the hearing, Dean Lefstein concluded the sanction of expulsion was warranted.

(R. 900). Dean Lefstein testified that his decision to expel Gagne was based upon the evidence presented to him at the hearing on November 28th; thus, the evidence supports the trial court's finding. Unlike the board in *Doran*, Dean Lefstein did not rely on evidence not presented at the hearing in making his decision to expel Gagne.

Gagne next argues that he is entitled to due process protection in both the determination of misconduct and the determination of the appropriate sanction, directing us to *Lamb v. Panhandle Community Unit School District No. 2*, 826 F.2d 526 (7th Cir.1987), which cited *Betts v. Board of Educ. of the City of Chicago*, 466 F.2d 629, 633 (7th Cir. 1972), as follows:

> [D]ue process may also contemplate affording the plaintiff an opportunity to be heard on the question of what discipline is warranted by the identified offense. Although the meting out of disciplinary punishment is a matter left largely to the discretion of the school authorities, since a penalty which is tantamount to expulsion was involved, and since that penalty was discretionary rather than prescribed, the school authorities were plainly required to give the plaintiff and her parents some opportunity to present a *mitigative* argument.

Both *Lamb* and *Betts* concerned discipline of high school students. Further, after stating the above, *Betts* held that because the student and her mother had been notified about a pending conference and about the student's actions at issue, and both had the opportunity to say whatever they wished at the two hour conference with the disciplinarian, the failure to specifically advise the mother of

the possibility of the sanction imposed did not deny the student due process.

■ Nowhere does Gagne contend that he was unaware that he faced possible expulsion for the charged misconduct. His attention was directed to the possible penalties in the initial October 27, 1994, notice that he had been charged with misconduct. His attorney's summary of the presentation to Dean Kearney on November 4th repeatedly asserts that Gagne did not intentionally fail to disclose or misrepresent, describes Gagne's remorse, and pleads for an opportunity to continue at the Law School. At the conclusion of the hearing before Dean Lefstein, Courtney's (Gagne's attorney) closing was similar. Courtney testified that Gagne was afforded notice on the allegations of misconduct, that he responded to the allegations at the hearing with Dean Lefstein, and that he "was given an opportunity to present any mitigative argument that he had as to the charges." (R. 2017). Consistent with *Betts,* the procedures here did not deny Gagne due process.

■ Finally, Gagne makes a general argument that the trial court's findings of fact and conclusions of law that his due process rights were not violated by Dean Lefstein's reliance on post-hearing, *ex parte* evidence gathering in determining the appropriate sanction are clearly erroneous. He cites conflicting testimony; however, as we have already observed, evidence supports the finding that Dean Lefstein did not rely on later-gathered evidence. He claims the trial court erroneously relied on *Brewer v. Austin Independent School District,* 779 F.2d 260, 263 (5th Cir.1985), to conclude that "communications made outside the hearing process in an attempt to establish circumstances which would mitigate the imposition of the sanction of expulsion do not deprive Plaintiff of his due process rights." (R. 904). In *Brewer,* a 16 year-old student admitted possessing marijuana but contended that allegations of drug dealing and drug use were also considered by the disciplinary board, allegations which he claimed to have had no opportunity to rebut. The Fifth Circuit first noted that because Brewer admitted possession, and the punishment he received was within the limits autho-

rized by school board policy, "the validity of the suspension itself is beyond question." 779 F.2d at 263. The court then declared that it would not "escalate the formality of the suspension process" beyond the "notice and hearing requirements already imposed" to require that school administrators provide "a fact hearing as to the accuracy of each bit of evidence considered in determining the appropriate length of the punishment." *Id.* Despite his claim that his case differs from *Brewer,* the principle of law for which the trial court cited it is good law, and the trial court did not err in relying on *Brewer.*

### 2. Contract Claim

■ The relationship between a university and its students is considered contractual in nature. *See Neel v. I.U. Bd. of Trustees,* 435 N.E.2d 607, 610 (Ind.Ct.App.1982). Gagne contends that his contractual relationship with the Law School is defined by the Code of Ethics and that the Law School breached that contract by failing to provide him the review board specified in the Code.

Under the Code, disciplinary procedures for personal misconduct begin with the requirement that the student be notified that disciplinary proceedings have been initiated by the Dean of Students. Then follows "Action by the Dean of Students," where the student meets with the Dean of Students, to discuss the allegations and allow the student to make responses and explanations, after which the Dean of Student imposes a sanction—ranging from reprimand and warning to permanent expulsion from the university. The student may then appeal to the Dean of the school. At this point, the Code provides as follows:

5. **Appeal to the Dean of the School**

  a. When an appeal concerning a decision of the Dean of Students has been submitted to the Dean of the school, the Dean of the school should inquire into the facts of the appeal and should discuss the matter individually with the student and the Dean of Students.

  b. If the Dean of the school considers it to be appropriate, the Dean of the school may ask the student and the Dean of Students to meet together

with the Dean of the school in an effort to resolve the appeal.

c. In resolving the appeal, the Dean of the school may sustain, reverse, or modify any decision of the Dean of Students concerning the student's alleged act of misconduct.

d. If the appeal is not resolved, the Dean of the school must submit the appeal to a review board for consideration.

(R. 1090–91).

When the trial court reviewed the Law School's application of its Code, its "sole function" was to determine whether the Law School acted illegally, arbitrarily or capriciously, and the court was bound to accept the evidence most favorable to support the Law School's action. *Riggin v. Board of Trustees of Ball State Univ.*, 489 N.E.2d 616, 625 (Ind.Ct.App.1986), *trans. denied.* Dean Lefstein testified that the above Code provisions required him "to submit the appeal to a review board if [he is] unable to resolve the appeal," and whether the Dean is able to resolve the appeal means whether the Dean is able "to come to a decision of the matter." (R. 1450, 1451). Thus, if the Dean of the Law School "could come to a firm decision respecting the matter," the Dean could resolve the matter, and no review board was necessary. (R. 1786). The trial court concluded that the Code did not compel the Dean to appoint a review board to hear this matter because the Dean's decision to sustain Dean Kearney's expulsion of Gagne "completely resolved the matter." (R. 917). This conclusion followed the trial court's finding that a common dictionary definition of the word "resolve" is "to reach a firm decision about." (R. 902). The trial court did not err in failing to find this application of the Code arbitrary or capricious.

The trial court considered Gagne's argument "that the Dean must submit the matter to a review board if the appeal is not resolved by the Dean to the satisfaction of all the parties." *Id.* However, the trial court again noted the accepted definition of "resolve" as meaning "to reach a firm decision about," *id.*, and cited *Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129, 1132 (Ind.Ct.App.1995), *trans. denied,*

for the proposition that the parties' disagreement on the interpretation of a contract does not establish an ambiguity. The court then found

as a matter of law, the contract is not ambiguous and that the Law School's interpretation, including its interpretation of other words and phrases in its Code, such as "false statement," "misconduct," and "material," etc., are based upon commonly accepted meanings; therefore, there is some evidence to support its interpretation of its own regulations which is not an unreasonable one.

*Id.*

The trial court's findings are supported by the evidence, and the findings support the trial court's conclusion that as a matter of law Gagne had no contractual right under the Code to a hearing before a review board. Gagne has not shown that all the evidence is without conflict and all reasonable inferences to be drawn from the evidence leads to no other conclusion but that the Code gives him such a contractual right. *See Estate of McClenahan.*

We affirm.

BARTEAU and GARRARD, JJ., concur.