**UACC MIDWEST, INC., successor by merger to Evansville Cable Television, Inc., Petitioner,**

**v.**

**INDIANA DEPARTMENT OF STATE REVENUE and Kenneth L. Miller, Commissioner of the Indiana Department of State Revenue, Respondents.**

**No. 49T10–9204–TA–00012.**

Tax Court of Indiana.

July 3, 1996.

---

John W. Allen, Patrick R. Van Tiflin, Michelle L. Halloran, Howard & Howard Attorneys, P.C., Lansing, MI, for Petitioner.

Pamela Carter, Attorney General of Indiana, Marilyn S. Meighen, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

UACC Midwest, Inc. (UACC) appeals a final determination of the Indiana Department of State Revenue (the Department) taxing UACC's gross income under IND.CODE 6–2.1–2–3 at the rate of one and two-tenths percent (1.2%) rather than at the rate of three-tenths of one percent (0.3%).

### ISSUES

I. Whether UACC's income is derived from "selling at retail" or "the provision of a service" under the Indiana Gross Income Tax Act.

II. Whether the Indiana Gross Income Tax Act, as applied to cable television operators, is unconstitutional.

III. Whether the Department is entitled to recover the refund it issued to UACC for the calendar year 1990.

### FACTS & PROCEDURAL HISTORY

UACC, a Delaware corporation, is a cable television operator with Indiana offices in Anderson and Evansville. As a cable television operator, UACC engages in three primary activities: 1) it provides cable television programming to subscribing viewers for a fee (cable subscriptions); 2) it sells advertising time on cable television; and 3) it produces video programming and advertisements to be shown on cable television. While all three of these activities generate income for UACC, the majority of UACC's income is derived from its cable subscriptions.

This case arose when UACC decided that it had over-reported the amount of gross income tax it owed the State of Indiana. Specifically, after reporting that its gross income was subject to taxation at the rate of 1.2%, UACC decided that its income was actually subject to taxation at the rate of 0.3%. Consequently, UACC filed a series of amended tax returns with the Department seeking refunds of excessive gross income taxes paid for: 1) the period of September 1, 1985 through August 31, 1986; 2) the fiscal year ending August 31, 1987; 3) the shortened calendar year of September 1, 1987 through December 31, 1987; 4) the calendar year 1988; 5) the calendar year 1989; and 6)

the calendar year 1990. The Department approved the refunds for the period of September 1, 1985 through August 31, 1986 and the calendar year 1990. The Department denied all other refunds.

On April 8, 1992, UACC filed an appeal with this court in an attempt to secure the refunds that had been denied. The Department filed a counterclaim asserting that it was entitled to reassess UACC for the period of September 1, 1985 through August 31, 1986 and the calendar year 1990. In other words, the Department asserts that it erroneously issued the refunds to UACC for those periods and is therefore entitled to recover them.

After considering a number of preliminary motions, this court determined that it did not have jurisdiction to hear UACC's appeal as it related to the fiscal year ending August 31, 1987, and the shortened calendar year of September 1, 1987 through December 31, 1987, as UACC did not timely file its amended returns for those periods. *UACC Midwest, Inc. v. Indiana Dep't of State Revenue,* 629 N.E.2d 1295, 1299 (Ind.Tax 1994) (*UACC I*). This court also determined that the Department could not recover the refund it issued to UACC for the calendar year 1986. *Id.* at 1301. Consequently, this court will consider UACC's appeal only as it relates to the calendar year 1988, the calendar year 1989, and the portion of the Department's counterclaim relating to the refund it issued to UACC for the calendar year 1990.

### STANDARD OF REVIEW

■ "The court reviews appeals from the Department *de novo.*" *Kenny Kent Chevrolet Co. v. Indiana Dep't of State Revenue,* 627 N.E.2d 890, 891 (Ind.Tax 1994). Thus, "the court is bound by neither the issues nor the evidence at the administrative level." *Id.*

### DISCUSSION AND ANALYSIS

#### I

■ The Indiana Gross Income Tax Act, IND.CODE 6–2.1–1–1 through 6–2.1–8–10, imposes a tax upon the receipt of: "(1) the entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana; and (2) the taxable gross income derived

from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana." I.C. 6–2.1–2–2. The gross income tax is imposed at one of two rates: 0.3% or 1.2%. I.C. 6–2.1–2–3.

In determining which of the two rates is to be applied, "the type of transaction from which the taxable gross income is received" governs. I.C. 6–2.1–2–2. Specifically, gross income received from the following transactions is taxed at the rate of 0.3%:

(1) wholesale sales;

(2) display advertising, including outdoor painted and poster display advertising and radio and television media advertising, but not including any sale or rental of tangible property or any personal professional service rendered in connection with such advertising;

(3) the business of dry cleaning and laundering, excluding the operation of coin operated laundry and dry cleaning equipment;

(4) *selling at retail;*

(5) the business of softening and conditioning water, including the exchange of water softening and conditioning tanks in the ordinary course of business, but not including the preparation of customer's plumbing and other work incident to installing such tanks in the first instance;

(6) the renting or furnishing for periods of less than thirty (30) days any rooms, lodgings, or any other accommodations, including booths, display spaces, and banquet facilities that are located in a place where rooms, lodgings, or any other accommodations are regularly furnished for a consideration; and

(7) the business of commercial printing that results in printed materials, excluding the business of photocopying.

I.C. 6–2.1–2–4 (emphasis added). The 1.2% rate, however, applies to gross income received from:

(1) producing, transmitting, furnishing, wholesaling, or retailing electrical energy;

(2) producing, transporting, furnishing, wholesaling, or retailing artificial gas, natural gas, or a mixture of natural and artificial gas;

(3) operating a steam or electric railway, streetcar line, motor vehicle, steam or motorboat, or any other vehicle for the transportation of freight, express, or passengers for hire;

(4) operating a pipeline for the transportation of any commodity for hire;

(5) operating a telephone or telegraph line;

(6) operating a water or sewerage system;

(7) operating any other utility which is not described in this section;

(8) activities described in sections 3, 4, 5, 6, 7, 8, or 9 of IC 6–2.1–1 that are taxable on a gross earnings basis; and

(9) *any activity which is not described in section 4 of this chapter including the provision of services of any character,* sales of real estate, rentals (except rentals described in section 4(6) of this chapter), the performance of contracts, and the investment of capital.

I.C. 6–2.1–2–5 (emphasis added).

In the case at bar, UACC claims that its income should have been taxed at the rate of 0.3% rather than 1.2% because it was received in the course of "selling at retail" under I.C. 6–2.1–2–4, and not from "the provision of a service" under I.C. 6–2.1–2–5. In other words, UACC argues that its income is derived from the *sale* of cable television programming.

The term "selling at retail," as it is used in the Gross Income Tax Act, is defined in I.C. 6–2.1–2–1. It provides in relevant part:

"Selling at retail" means a transaction in which a retail merchant in the ordinary course of his regularly conducted business transfers the ownership of *tangible personal property* to another, conditionally or otherwise, for consideration if:

(A) the retail merchant had previously acquired that tangible personal property for the purpose of reselling it; and

(B) the transferee acquiring the property does not acquire the tangible personal property for the purpose of making a wholesale sale.

I.C. 6–2.1–2–1(b)(1) (emphasis added). *See also* 45 I.A.C. 1–1–13. Under this definition, UACC is not "selling at retail" because cable television programming is *not* tangible personal property. Indeed, cable television programming does not have physical form; it is not capable of being touched. *See Black's Law Dictionary* 1305–06 (5th ed. 1979). *See also Indiana Dep't of State Revenue v. Cable Brazil, Inc.,* 177 Ind.App. 450, 456–60, 380 N.E.2d 555, 558–61 (1978) (holding that cable television signals are not tangible personal property). Consequently, because UACC's income is not derived from "selling at retail," it is derived from "the provision of a service."

■ UACC acknowledges that cable television programming is not tangible personal property. *Transcript of February 7, 1996 Oral Argument* at 28–29. Nevertheless, it attempts to convince the court that its income should be considered received from "selling at retail" for two reasons. First, it states that "cable revenues for gross income tax purposes are subject to reclassification, and are properly characterized as retail receipts, not receipts for services, consistent with the categorization of persons furnishing local cable television service or intrastate cable television service as 'retail merchants' [for purposes] … of the Indiana Gross Retail Tax Act, I.C. 6–2.5–1–1 *et seq.*" *Complaint* at 3–6. In other words, UACC argues that because cable television operators are considered "retail merchants" for purposes of the Indiana sales tax, they should be considered "retail merchants" for purposes of the Indiana gross income tax as well. UACC is mistaken.

The court recognizes that under the Indiana Gross Retail Tax Act, cable television operators are considered retail merchants. Indeed, IND.CODE 6–2.5–4–11(a) provides that "[a] person is a retail merchant making a retail transaction when he furnishes local cable television service or intrastate cable television service." This statute is not relevant, however, to the case at bar.

■ When a statutory word is defined in the act of which it is a part, the court will not disregard the definition in favor of one found in an entirely different act. *See Tillman v. Snow,* 571 N.E.2d 578, 579–80 (Ind.App. 1991). Under the Gross Income Tax Act, a retail merchant is defined as "a taxpayer who is regularly and occupationally engaged in the business of purchasing *tangible personal property* and providing the *tangible personal property* to his customers …." I.C. 6–2.1–1–12. Because cable television programming is not tangible personal property, UACC is not a "retail merchant" under the Gross Income Tax Act. Consequently, UACC's income is not considered, or "subject to reclassification as," retail receipts.[1]

Second, UACC asserts that because neither I.C. 6–2.1–2–4 nor I.C. 6–2.1–2–5 specifically set forth the rate at which income received from cable television programming is to be taxed, it must be taxed in the same manner as the listed activity to which "it is most closely aligned." UACC contends that the activity "most closely aligned" to cable television programming is "selling at retail" and not "the provision of a service." Again, UACC is mistaken.

■ UACC is correct in that the Gross Income Tax Act does not specifically define cable television programming as "the provision of a service." But just as a court cannot disregard an applicable definition in favor of an inapplicable one, *see Tillman,* 571 N.E.2d at 579–80, a court may consider a statutory definition of a word as it is used in another act if the statutory word is *not* specifically defined in the act of which it is a part. *See Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs,* 656 N.E.2d 1208, 1214, n. 9 (Ind. Tax 1995). Consequently, the court may look to other acts within the Indiana Code for guidance in determining whether cable television programming is "the provision of a service."

In so doing, the court notes that the term "cable television programming" is not defined anywhere in the Indiana Code. For purposes of the Indiana sales tax, however, I.C. 6–2.5–4–11(a) states that "[a] person is a

---

1. The Department's regulations state that while a person may be considered a "retail merchant" for purposes of the Indiana sales tax, he may not necessarily be a "retail merchant" for purposes of the Indiana gross income tax. *See* 45 I.A.C. 1–1–12.

retail merchant making a retail transaction when he furnishes local cable television *service* or intrastate cable television *service.*" (Emphases added). This is significant because it reveals the legislature's intent that cable television programming be regarded as "the provision of a service." *See Cable Brazil,* 380 N.E.2d at 559.

Furthermore, federal case law interpreting the Clayton Act, 15 U.S.C.A. §§ 12–27,[2] characterizes cable television programming as "the provision of a service." *See TV Communications Network, Inc. v. ESPN, Inc.,* 767 F.Supp. 1062 (D.Colo.1991), *aff'd* 964 F.2d 1022 (10th Cir.1992), *cert. denied* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537; *H.R.M., Inc. v. Tele–Communications, Inc.,* 653 F.Supp. 645 (D.Colo.1987); *Rankin County Cablevision v. Pearl River Valley Water Supply Dist.,* 692 F.Supp. 691 (S.D.Miss.1988); *Gall v. Home Box Office, Inc.,* 1992 WL 230245 (S.D.N.Y.1992); *Satellite Television,* 586 F.Supp. 973. Indeed, these cases state that cable television companies are in the business of providing an "entertainment service." *See generally Satellite* at 976.

Both Indiana and federal law characterize cable television programming as "the provision of a service." Accordingly, UACC's income received from its cable television programming is income received from "the provision of a service," and not from "selling at retail."

## II

■ UACC asserts that the Indiana Gross Income Tax Act, as it applies to cable television operators, violates: 1) the equal protection guarantees set forth in the Fourteenth Amendment to the U.S. Constitution and Article 1, § 23 of the Indiana Constitution; 2) the Commerce Clause of the U.S. Constitution; 3) the First Amendment to the U.S. Constitution; and 4) the Supremacy Clause of the U.S. Constitution. The court notes that the Indiana Gross Income Tax Act, as a series of duly promulgated statutes, "enjoy[s] a strong presumption of constitutionality, and the party challenging the constitutionality bears the burden to overcome the presumption." *Roehl Transport, Inc. v. Indiana Dep't of State Revenue,* 653 N.E.2d 539, 545 (Ind.Tax 1995).

### A. Equal Protection

■ UACC maintains that it is being denied equal protection of the law under the Fourteenth Amendment to the U.S. Constitution and Article 1, § 23 of the Indiana Constitution.[3] More specifically, UACC contends that because it provides news, sports, entertainment, educational and informational programming, it is similarly situated to conventional television broadcasters. UACC notes, however, that while its gross income is taxed at the rate of 1.2%, the gross income of conventional television broadcasters is either wholly exempt under IND.CODE 6–2.1–3–28[4], or taxed at the rate of 0.3%.

■ Under the Equal Protection Clause, "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. *See also* IND. CONST. art. 1, § 23. Nevertheless, the Equal Protection Clause "does not forbid classifications. It simply keeps governmental decision makers from treating

---

2. The Clayton Act, enacted in 1914 as an amendment to the Sherman Antitrust Act which deals with unfair trade practices, "prohibits price discrimination, tying and exclusive dealing contracts, mergers, and interlocking directorates, where the effect may be substantially to lessen competition or tend to create a monopoly in any line of commerce." *Black's Law Dictionary* 227 (5th ed. 1979). It applies only to transactions involving "goods, wares, merchandise, machinery, supplies, or other commodities" [the term "commodity" being defined as some type of tangible property that may be leased or sold], and is inapplicable to the sale of services. 15 U.S.C. § 14; *Satellite Television and Associated Resources, Inc. v. Continental Cablevision of Vir-*

*ginia, Inc.,* 586 F.Supp. 973, 975 (E.D.Va.1982), *aff'd* 714 F.2d 351, 358 (4th Cir.1983), *cert. denied* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984).

3. The rights guaranteed under both provisions are identical. *Haas v. South Bend Community School Corp.,* 259 Ind. 515, 526, 289 N.E.2d 495, 501 (1972).

4. I.C. 6–2.1–3–28 provides:

   Gross receipts derived directly from a national broadcasting network for broadcasting national network programs are exempt from gross income tax.

differently persons, who in all relevant respects are alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1, 12 (1992). In other words, the Equal Protection Clause does not require that all persons be treated identically or equally; rather, equal protection analysis is implicated only if an individual has been treated differently from similarly situated persons. *Hammond v. Auburn Univ.,* 669 F.Supp. 1555, 1563 (M.D.Ala.1987), *aff'd,* 858 F.2d 744 (11th Cir.1988), *cert. denied* 489 U.S. 1017, 109 S.Ct. 1134, 103 L.Ed.2d 195 (1989).

UACC is not similarly situated to conventional television broadcasters. Indeed, in determining which tax rate should be applied to a taxpayer's Indiana gross income, "the controlling factor is not the character of the Taxpayers' business, *but the source of the income." Indiana Dep't of State Revenue v. Commercial Towel & Uniform Serv., Inc.,* 409 N.E.2d 1121, 1123 (Ind.App.1980) (emphasis added). Consequently, "[t]he rate does not depend upon the business in which the taxpayer is primarily engaged, but upon the activity from which each item of his gross income is received." *Id.* (quoting *Storen v. J.D. Adams Mfg. Co.,* 212 Ind. 343, 348, 7 N.E.2d 941, 943 (1937)).

While UACC is engaged in the same sort of business as conventional television broadcasters,[5] it receives its income from a different source. Specifically, UACC receives its income by charging its viewers for cable television programming. Conventional television broadcasters, on the other hand, receive their income from non-viewer sources, such as media advertising. Consequently, a sufficient difference exists that justifies UACC's separate classification and differential tax treatment.

In turn, UACC argues that it is similarly situated to conventional television broadcasters because they both receive income from media advertising. UACC asserts that while the gross income it receives from media advertising is taxed at the rate of 1.2%, the gross income conventional television broadcasters receive from media advertising is taxed at the rate of 0.3%.

Under the Indiana Gross Income Tax Act, income received from "media advertising, but not including any ... personal professional service rendered in connection with such advertising" is subject to taxation at the rate of 0.3%. I.C. 6–2.1–2–4(2). Thus, the plain language of the statute requires that *all* income received from media advertising be taxed at the rate of 0.3%—regardless of the character of the taxpayer or his business activities. Consequently, if the portion of UACC's gross income attributable to media advertising was taxed at the rate of 1.2%, as appears to be the case, then the Department misapplied the law.[6] A misapplication of the law, however, is simply that—a misapplication of the law. It does not render the Indiana Gross Income Tax Act unconstitutional.

Finally, UACC argues that because it derives income from carrying interstate communications, it is similarly situated to telephone and telegraph companies. UACC explains, however, that while it pays gross income tax on that income, telephone and telegraph companies are exempt from taxation altogether.

UACC is not similarly situated to telephone and telegraph companies. As the court explained earlier, when determining which tax rate should be applied to a taxpay-

---

**5.** At least one court has held, however, that cable television providers and conventional television broadcasters are engaged in a wholly dissimilar business. *See Capitol Cablevision Corp. v. Hardesty,* 168 W.Va. 631, 644, 285 S.E.2d 412, 420 (1981) ("[i]n essence, television broadcasters are in the business of generating and transmitting broadcast signals to the general public, while [cable television] system operators are in the business of enhancing and facilitating reception of those signals").

**6.** Of course, UACC must "segregate" or separately document the income that it receives from media advertising in order for that income to be taxed at the rate of 0.3%. Indeed, "[i]t is a general rule that a taxpayer must segregate and separate items having different tax liability or exemptions in order to bring himself within such provisions, and a failure or inability to do so subjects the unsegregated amount to the regular rate or the highest rate if so provided by statute." *Western Adjustment and Inspection Co. v. Gross Income Tax Div.,* 236 Ind. 639, 643, 142 N.E.2d 630, 632 (1957). *See also* I.C. 6–2.1–2–7.

er's Indiana gross income, "the controlling factor is not the character of the Taxpayers' business, but the source of the income." *Commercial Towel & Uniform Serv.*, 409 N.E.2d at 1123. UACC and telephone and telegraph companies do not receive their income from similar sources.

More specifically, the income UACC receives from transmitting television broadcast communications, which originate outside Indiana and are transmitted to in-state subscribers, is income derived from "the provision of a *local* service." *See* 45 I.A.C. 1–1–124(c) ("[i]ncome from providing cable television services in Indiana is taxable regardless of where the television transmissions themselves originate or are received, as the taxpayer is providing a local service"). Indeed:

> While the [cable television] business is in interstate commerce and is an integral part of interstate commerce, it constitutes the last stage of the interstate transmission of the television signals. It is one continuous interstate transmission to the viewer's television set, *but the apparatus of the [cable television] system is an appendage to the primary interstate broadcasting facilities with incidents much more local than national, involving cable equipments through the public streets and ways, local franchises, local intra-state advertising and selling of services and local intra-state collections. In this perspective, a [cable television system] is essentially a local business* and, in its impact on interstate commerce, is analogous to a local express or parcel delivery service or a local pilotage or lighter service organized to facilitate the final interstate delivery of goods to the named consignee.

*TV Pix, Inc. v. Taylor*, 304 F.Supp. 459, 463 (D.Nev.1968), *aff'd*, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970) (emphasis added). Thus, the income UACC derives from its cable subscriptions is locally derived income—only residents of Indiana subscribe to, and pay for, UACC's programming.

The income that telephone and telegraph companies receive from transmitting their electronic signals, on the other hand, is not income derived from "the provision of a *local* service." Rather, an interstate telephone call triggers simultaneous activity in several states, and is not a purely local event. *Goldberg v. Sweet*, 488 U.S. 252, 262, 109 S.Ct. 582, 589, 102 L.Ed.2d 607, 617 (1989). More specifically:

> a computerized network of electronic paths transmits thousands of electronic signals per minute through a complex system of microwave radios, fiber optics, satellites, and cables. When fully connected, this network offers billions of paths from one point to another. When a direct path is full or not working efficiently, the computer system instantly activates another path. Signals may even change paths in the middle of a telephone call without perceptible interruption. Thus, the path taken by the electronic signals is often indirect and typically bears no relation to state boundaries.

*Id.* at 254–55, 109 S.Ct. at 585, 102 L.Ed.2d at 612–13 (citations omitted). Furthermore, the income telephone and telegraph companies receive from transmitting these interstate communications or signals is from the consumer, or the person making the call. When the call is made by a consumer outside Indiana to a person in Indiana, the telephone company receives its income from the out-of-state consumer. Thus, the income that telephone and telegraph companies receive from carrying electronic transmissions originating outside Indiana to people in Indiana is income derived from out-of-state sources.

In summary, equal protection analysis is implicated only if an individual has been treated differently from similarly situated persons. *Hammond*, 669 F.Supp. at 1563. UACC is not similarly situated to conventional television broadcasters or telephone and telegraph companies because it receives its income from different sources. UACC is, however, similarly situated to conventional television broadcasters with respect to the income it receives from media advertising. Consequently, if the portion of UACC's gross income attributable to media advertising was taxed at the rate of 1.2%, then the Department misapplied the law. Regardless, the Indiana Gross Income Tax Act does not violate UACC's equal protection guarantees.

## B. The Commerce Clause

UACC also maintains that the Indiana Gross Income Tax Act violates the Commerce Clause of the U.S. Constitution. While the purpose of the Commerce Clause is to prevent discrimination in favor of intrastate commerce at the expense of interstate commerce, *Goldberg,* 488 U.S. at 266, 109 S.Ct. at 591–92, 102 L.Ed.2d at 620, the United States Supreme Court has expressly rejected the view that interstate commerce is immune from state taxation. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 288, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326, 336–37 (1977). Consequently, a state tax will withstand a challenge under the Commerce Clause if "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279, 97 S.Ct. at 1079, 51 L.Ed.2d at 331.

In the case at bar, UACC only challenges whether the Indiana Gross Income Tax Act discriminates against interstate commerce. *Petitioner's Post–Trial Brief* (filed Oct. 10, 1995) at 48. Indeed, UACC maintains that the Indiana Gross Income Tax Act discriminates against UACC's interstate commerce activities in that it: (1) requires the imposition of a tax against UACC at a higher rate than that applied to other entities which receive gross income from media advertising; (2) wholly exempts from taxation the income derived directly from a national broadcasting network for broadcasting national network programs under I.C. 6–2.1–3–28, but does not exempt the income of UACC even though its broadcasting activities are also national in scope; and (3) excludes from taxation the income of telephone and telegraph companies derived by carrying interstate communications under 45 I.A.C. 1–1–124(b), but does not exclude the income of UACC even though it, too, carries interstate communications. *Petitioner's Post Trial Brief* at 49.

The court observes that UACC's interstate commerce arguments are really its equal protection arguments recast in another form. Indeed, UACC does not argue that the Indiana Gross Income Tax Act impermissibly discriminates against interstate commerce in favor of intrastate commerce. Instead, it argues that the Indiana Gross Income Tax Act treats some persons engaged in interstate commerce differently than other persons engaged in interstate commerce.

Nevertheless, the Indiana Gross Income Tax Act does not discriminate against UACC's interstate commerce activities. Indeed, "[w]hen a tax on gross receipts reaches only that part of the commerce which is carried on within the taxing state, whether it be intrastate or interstate, it is constitutionally valid and does not violate the Commerce Clause." *Ceracche Television Corp. v. Kelly,* 50 A.D.2d 134, 137, 376 N.Y.S.2d 217, 221 (N.Y.A.D.1975). *See also Rhoden v. Goodling Enterprises, Inc.,* 295 So.2d 433, 435 (Miss.1974) (if all the activities upon which a tax is imposed occur within one state, the tax does not discriminate against interstate commerce in favor of competing intrastate commerce of a similar character). Since the income that UACC derives from its cable subscriptions is derived from "the provision of a service" within Indiana only, the Indiana Gross Income Tax Act does not violate the Commerce Clause.

## C. The Right to Free Speech Under the First Amendment

Next, UACC maintains that the Indiana Gross Income Tax Act violates the expressive activities of cable television operators protected by the First Amendment to the U.S. Constitution. Specifically, UACC argues that the Indiana Gross Income Tax Act has singled out cable television operators for payment of taxes at a higher rate, while other identically situated electronic speakers (i.e., local network affiliates, wireless broadcasters, and radio operators) pay taxes at a lower rate.

While cable television operators, who provide news, information, and entertainment to their subscribers, are engaged in "speech" and are part of the "press," the fact that they are taxed differently from other media does not itself raise First Amendment concerns. *Leathers v. Medlock,* 499 U.S. 439, 444, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494, 502 (1991).

Indeed, differential taxation of First Amendment speakers is constitutionally suspect only if it threatens to suppress the expression of particular ideas or viewpoints, targets a small group of speakers, or it discriminates on the basis of the content of the taxpayer's speech. *Id.* at 447, 111 S.Ct. at 1443–44, 113 L.Ed.2d at 503–04. UACC claims that the fact that it has been singled out for payment of taxes at a higher rate demonstrates "an intent to suppress speech and the free flow of ideas." *Petitioner's Post–Trial Brief* at 56. The court disagrees.

Indiana's gross income tax is a tax of general applicability. It applies to the receipt of all income from the sale of tangible personal property and a broad range of services. *See* I.C. 6–2.1–2–4; I.C. 6–2.1–2–5 (income received from dry cleaning, the softening and conditioning of water, the rental of rooms, the provision of electric, gas, and steam services, as well as cable television programming, is subject to taxation). Consequently, the gross income tax does not single out the press or raise concerns about censorship of critical ideas and opinions. *See Leathers* at 447, 111 S.Ct. at 1443–44, 113 L.Ed.2d at 503–04.

Furthermore, the Indiana Gross Income Tax Act has not targeted cable television operators in a purposeful attempt to interfere with their First Amendment activities. More specifically, while the gross income tax is applied at one of two rates under I.C. 6–2.1–2–3, the rate of 1.2% is applied to *all* taxpayers whose gross income is received from the provision of a service, and not just cable television operators. Thus, while the Gross Income Tax Act applies different tax rates to income from different sources, all income from similar sources is subject to the same tax rate.

Finally, Indiana's gross income tax is not content based. Indeed, nothing in the tax's imposition statutes refers to the content of media communications. UACC provides a mixture of news, information and entertainment to its subscribers. This programming is no different than the communications of other media members, such as newspapers, magazines, or radio.

In summary, a tax scheme that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas. *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 547–48, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129, 137–38 (1983). Because the Indiana Gross Income Tax Act does not discriminate on the basis of ideas, but only on the source of income, it does not violate the protections afforded to UACC under the First Amendment. *See id.* at 547, 103 S.Ct. at 2002, 76 L.Ed.2d at 138 (holding that state legislatures have especially broad latitude in creating classifications and distinctions in tax statutes).

### D. The Supremacy Clause

Finally, UACC argues that the Indiana Gross Income Tax Act conflicts with, and is preempted by,[7] the Federal Cable Communications Policy Act of 1984 (the Cable Act). *See* 47 U.S.C. § 521 *et seq.* Specifically, UACC argues that Indiana's gross income tax constitutes an unduly discriminatory "franchise fee" prohibited under the Cable Act. The court disagrees.

The Cable Act protects cable operators from excessive "franchise fees" imposed by state and local governments. *See* 47 U.S.C. § 542(b). The term "franchise fee" is defined as "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator ... solely because of [its] status as such." 47 U.S.C. § 542(g)(1). The term "franchise fee" does not include "any tax, fee, or assessment of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators or their services but not including a tax, fee, or assessment which is unduly discriminatory against cable operators or cable subscribers)." 47 U.S.C. 542(g)(2). As a result, state and local governments are free to impose taxes, fees, and

---

7. Article VI, Clause 2 of the United States Constitution provides:

This Constitution, and the laws of the United States which shall be made in pursuance there-of; ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the ... laws of any state to the contrary notwithstanding.

assessments against cable television operators as long as they are of general applicability and are not unduly discriminatory. *See id.; see also Medlock v. Leathers*, 311 Ark. 175, 184, 842 S.W.2d 428, 433 (1992).

UACC insists that Indiana's gross income tax is unduly discriminatory because it violates cable television operators' rights to equal protection of the law, burdens their interstate commercial activities, and operates to quash their First Amendment rights. As this court has previously explained, however, the Indiana gross income tax does none of these things.

Furthermore, the Indiana gross income tax is a tax of general applicability. Indeed, the rate of 1.2% is applied to all taxpayers who derive their income from "the provision of a service." Indiana's gross income tax does not unduly discriminate against cable television operators, and, therefore, it does not constitute an unduly discriminatory "franchise fee." Consequently, UACC's preemption issue is without merit. *See id.* at 184, 842 S.W.2d at 434 (after finding that a particular state law did not unduly discriminate against cable television operators, the court held that the preemption issue was without merit).

## III

Finally, the court considers whether the Department is entitled to recover the refund it issued to UACC for the calendar year 1990. This court has previously held that there were no procedural impediments barring the Department from reassessing UACC for the calendar year 1990. *UACC I*, 629 N.E.2d at 1301. Having determined that UACC's Indiana gross income is subject to taxation at the rate of 1.2%, the court now holds that the Department is entitled to recover the refund it issued to UACC for calendar year 1990, plus interest as provided by law.[8]

## *CONCLUSION*

For the foregoing reasons, the court upholds the assessment levied against UACC for the calendar year 1988 and the calendar year 1989. In addition, the court holds that UACC must return to the Department the refund that was issued to it for the calendar year 1990 plus interest as provided by law.[9]

---

8. UACC complains that there is no statute which allows the Department to recover an erroneously issued refund and, therefore, this court has no authority to grant the Department relief on its counterclaim. The court disagrees. Under IND. CODE 6–8.1–5–2, the Department has authority to issue a proposed assessment anytime within the limitation period prescribed. As explained in *UACC I*, this court considers the Department's counterclaim a proposed assessment properly made in accord with I.C. 6–8.1–5–1. *UACC I*, 629 N.E.2d at 1301–02.

9. UACC raised the additional issue whether the court erred when it ruled that it had no jurisdiction to hear UACC's claim as it related to the 1987 fiscal year and the 1987 shortened tax year. *UACC I*, 629 N.E.2d at 1298–99. Given today's decision that the income UACC derives from the provision of cable television programming is subject to taxation at the rate of 1.2%, this issue is moot.