**RDI/CAESARS RIVERBOAT CASINO, LLC, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

**No. 49T10–0409–TA–40.**

Tax Court of Indiana.

Oct. 5, 2006.

Stephen H. Paul, Brent A. Auberry, Jon Laramore, Baker & Daniels, Indianapolis, IN, for Petitioner.

Steve Carter, Attorney General of Indiana, Andrew W. Swain, Special Counsel, Tax Section, John D. Snethen, Deputy Attorney General, Indianapolis, IN, for Respondent.

## ORDER ON PETITIONER'S MOTION FOR SUMMARY JUDGMENT

### FISHER, J.

RDI/Caesars Riverboat Casino, LLC (Caesars) appeals the final determination of the Indiana Department of State Revenue (Department), calculating Caesars's Riverboat Wagering Tax (RWT) liability for the period July 1, 2002 to June 30, 2003 (period at issue). The matter is currently before the Court on Caesars's motion for summary judgment. The issue for the Court to decide is whether the Department applied the proper RWT rate to Caesars's adjusted gross receipts for the period at issue. For the following reasons, the Court now DENIES Caesars's motion for summary judgment.

## FACTS AND PROCEDURAL HISTORY

The material facts in this case are undisputed. Caesars owns and operates a riverboat casino in Harrison County, Indiana. Caesars began full-time gaming operations on November 20, 1998. At that time, riverboat casinos in Indiana were allowed to conduct excursion gaming only (i.e., where passengers could embark and disembark a docked riverboat for 30 minutes before the riverboat would conduct two to four hour gambling cruises).

Effective July 1, 2002, however, the legislature legalized "flexible scheduling." Flexible scheduling "refers to the practice of conducting gambling games and allowing the continuous ingress and egress of passengers for the purpose of gambling while a riverboat is docked." IND.CODE ANN. § 4–33–2–7.5 (West 2002). In order to conduct flexible scheduling, licensed riverboat casino owners were required to submit an implementation plan to the Indiana Gaming Commission (Commission) for authorization. See IND.CODE ANN. § 4–33–6–21 (West 2002). Caesars received authorization from the Commission and implemented flexible scheduling on August 1, 2002.

For the period at issue, Caesars remitted $61,804,048.31 in RWT to the Department. The Department subsequently recalculated Caesars's RWT liability for the period at issue and issued a proposed. assessment to Caesars indicating that it owed an additional $4,390,402.24. Caesars paid the proposed assessment and then

filed a protest with the Department.[1] On June 8, 2004, the Department conducted an administrative hearing and, on July 30, 2004, issued a Letter of Findings (LOF) denying Caesars's protest.

Caesars initiated an original tax appeal on September 3, 2004. On January 27, 2006, Caesars filed its motion for summary judgment. The Court held a hearing on the motion on July 7, 2006. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

This Court hears appeals from final determinations of the Department *de novo* and therefore is not bound by the evidence or the issues presented at the administrative level. IND.CODE ANN. § 6–8.1–5–1(h) (West 2006); *Chrysler Fin. Co. v. Indiana Dep't of State Revenue,* 761 N.E.2d 909, 911 (Ind. Tax Ct.2002), *review denied.* Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). "When any party has moved for summary judgment, the [C]ourt may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." T.R. 56(B).

### Discussion

Prior to 2002, Indiana's RWT was flat rate tax. *See* IND.CODE ANN. § 4–33–13–1

(West 2001). Pursuant to the 2002 legalization of flexible scheduling, however, the RWT tax rate varied depending on the type of gaming operations conducted by the riverboat. For instance, riverboat casinos that did not implement flexible scheduling paid RWT on "adjusted gross receipts received from gambling games . . . at the rate of twenty-two and five tenths percent (22.5%) of the amount of the adjusted gross receipts." IND.CODE ANN. § 4–33–13–1(b) (West 2002). Riverboat casinos that implemented flexible scheduling, however, were subject to a graduated tax rate on their adjusted gross receipts pursuant to Indiana Code § 4–33–13–1.5.

That statute, as enacted, provided in pertinent part:

(a) This section applies only to a riverboat that has implemented flexible scheduling under [Indiana Code § ] 4–33–6–21 or [Indiana Code § ] 4–33–6.5. A graduated tax is imposed on the adjusted gross receipts received from gambling games authorized under this article as follows:

(1) Fifteen percent (15%) of the first twenty-five million dollars ($25,000,000) of adjusted gross receipts received during the period beginning July 1 of each year and ending June 30 of the following year.

(2) Twenty percent (20%) of the adjusted gross receipts in excess of twenty-five million dollars ($25,000,-

1. The legislature enacted a non-code provision during the 2003 session, which states in part:

[a]ll penalties and interest otherwise due from a riverboat that underpaid the amount of wagering tax due after June 30, 2002, and before May 1, 2003 . . . are waived if the riverboat pays the unpaid balance due in two (2) equal installments on the following dates: (1) July 1, 2003[; and] (2) July 1, 2004.

2003 Ind. Acts 224, § 48(e). Because Caesars paid the additional tax on the specified dates, it did not incur any penalties or interest. After paying the tax in full, Caesars filed a claim for refund in addition to its protest filed with the Department. The Department is holding Caesars's claim for refund in abeyance pending the outcome of this appeal.

000) but not exceeding fifty million dollars ($50,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(3) Twenty-five percent (25%) of the adjusted gross receipts in excess of fifty million dollars ($50,000,000) but not exceeding seventy-five million dollars ($75,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(4) Thirty percent (30%) of the adjusted gross receipts in excess of seventy-five million dollars ($75,000,000) but not exceeding one hundred fifty million dollars ($150,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(5) Thirty-five percent (35%) of all adjusted gross receipts in excess of one hundred fifty million dollars ($150,000,000).

The tax rates imposed under this section apply to adjusted gross receipts received beginning the date flexible scheduling is implemented under [Indiana Code § ] 4–33–6–21.

IND.CODE ANN. § 4–33–13–1.5 (West 2002).

Based on its interpretation of the statute, Caesars computed its RWT liability in two steps. For the month of July of 2002, Caesars applied the 22.5% flat tax rate to its adjusted gross receipts received that month because it had not yet implemented flexible scheduling. (*See* Pet'r Pet. at 4–5.) From August 1, 2002 to June 30, 2003, Caesars paid its RWT based on the graduated tax rates, applying the 15% tax rate to its first $25 million of adjusted gross receipts received once it implemented flexible scheduling. (*See* Pet'r Pet. at 4–5.)

In 2003, the legislature retroactively amended Indiana Code § 4–33–13–1.5. *See*

2003 Ind. Acts 224, § 46 (eff.7–1–02). More specifically, the legislature amended the statute to read as follows:

(a) This section applies only to a riverboat that has implemented flexible scheduling under [Indiana Code § ] 4–33–6–21.

(b) A graduated tax is imposed on the adjusted gross receipts received from gambling games authorized under this article as follows:

(1) Fifteen percent (15%) of the first twenty-five million dollars ($25,000,000) of adjusted gross receipts received during the period beginning July 1 of each year and ending June 30 of the following year.

(2) Twenty percent (20%) of the adjusted gross receipts in excess of twenty-five million dollars ($25,000,000) but not exceeding fifty million dollars ($50,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(3) Twenty-five percent (25%) of the adjusted gross receipts in excess of fifty million dollars ($50,000,000) but not exceeding seventy-five million dollars ($75,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(4) Thirty percent (30%) of the adjusted gross receipts in excess of seventy-five million dollars ($75,000,000) but not exceeding one hundred fifty million dollars ($150,000,000) received during the period beginning July 1 of each year and ending June 30 of the following year.

(5) Thirty-five percent (35%) of all adjusted gross receipts in excess of one hundred fifty million dollars ($150,000,000).

~~The tax rates imposed under this section apply to adjusted gross receipts received beginning the date flexible scheduling is implemented under [Indiana Code § ]4-33-6-21.~~

\* \* \* \*

**(g) If a riverboat implements flexible scheduling during any part of a period beginning July 1 of each year and ending June 30 of the following year, the tax rate imposed on the adjusted gross receipts received while the riverboat implements flexible scheduling shall be computed as if the riverboat had engaged in flexible scheduling during the entire period beginning July 1 of each year and ending June 30 of the following year.**

**(h) If a riverboat:**

**(1) implements flexible scheduling during any part of a period beginning July 1 of each year and ending June 30 of the following year; and**

**(2) before the end of that period ceases to operate the riverboat with flexible scheduling;**

**the riverboat shall continue to pay a wagering tax at the rates imposed under subsection (b) until the end of that period as if the riverboat had not ceased to conduct flexible scheduling.**

P.L. 224–2003, § 46 (*codified as* IND.CODE ANN. § 4–33–13–1.5 (West 2003)).[2] The legislature also enacted a non-code provision relating to Indiana Code § 4–33–13–1.5, which states:

(a) This SECTION applies to the calculation and collection of wagering taxes on the adjusted gross receipts of a riverboat received:

(1) on or after the date that the riverboat implemented flexible scheduling under IC 4–33–6–21; and

(2) before July 1, 2003.

(b) The definitions in IC 4–33–2 apply throughout this SECTION.

(c) The general assembly does not acquiesce in any interpretation of IC 4–33–13–1.5 and P.L. 292–2002(ss), SECTION 205 that excludes adjusted gross receipts of a riverboat received after June 30, 2002, and before the date that the riverboat implemented flexible scheduling under IC 4–33–6–21 from the determination of which wagering tax rate to apply to adjusted gross receipts of the riverboat received on or after the riverboat implemented flexible scheduling under IC 4–33–6–21.

(d) Wagering taxes imposed under IC 4–33–13–1.5 on adjusted gross receipts received on or after the date that the riverboat implemented flexible scheduling under IC 4–33–6–21 must be calculated and deposited using a graduated wagering tax rate selected (as stated in IC 4–33–13–1.5) through a calculation that includes "adjusted gross receipts received during the period beginning July 1 of each year and ending June 30 of the following year".

(e) All penalties and interest otherwise due from a riverboat that underpaid the amount of wagering tax due after June 30, 2002, and before May 1, 2003, as a result of a failure to include adjusted gross receipts received by the riverboat after June 30, 2002, and before the date that the riverboat implemented flexible scheduling under IC 4–33–6–21 in the

---

**2.** The portion of the statutory language that is stricken indicates the legislature's deletion of the language and the boldface language indicates new language added to the statute by the legislature in 2003. *See* P.L. 224–2003,

§ 46. Subsections (c)—(f) of the amended statute are not, however, relevant to the issue before the Court. *See* P.L. 224–2003, § 46; IND.CODE ANN. § 4–33–13–1.5(c)—(f) (West 2003).

determination of which wagering tax rate to apply to adjusted gross receipts received after the riverboat implemented flexible scheduling under [Indiana Code § ] 4–33–6–21 are waived if the riverboat pays the unpaid balance due in two (2) equal installments[.]

2003 Ind. Acts 224, § 48.

Based on its interpretation of the 2003 retroactive amendments and the non-code provision, the Department recalculated Caesars's RWT for the period at issue. (*See* Pet'r Pet., Ex. 1; Ex. 3 at 3–4.) Particularly, the Department applied the 22.5% flat tax rate to Caesars's July 2002 adjusted gross receipts and applied the graduated rates to Caesars's receipts received once it implemented flexible scheduling. (*See* Pet'r Pet., Ex. 2.) In determining the appropriate graduated tax rate, the Department used all of the adjusted gross receipts Caesars received from July 1, 2002 through June 30, 2003. (*See* Pet'r Pet., Ex. 2.)

Caesars argues that the Department's calculation is in contravention of the 2003 legislative amendments, because it claims the legislature intended for a riverboat's RWT to be assessed based on a single tax rate structure during any twelve-month taxing period. (*See* Oral Argument Tr. at 6.) More specifically, Caesars claims the deletion of the language in Indiana Code § 4–33–13–1.5(b) signifies the legislature's intent to change the law from a double RWT rate structure to a single RWT rate structure.[3] (*See* Pet'r Br. at 8–11 (*citing to Johnson County Farm Bureau Co-op. Ass'n v. Indiana Dep't of State Revenue*, 568 N.E.2d 578, 585 (Ind. Tax Ct.1991) (for the proposition that the deletion of statutory language raises the presumption of an intentional change in the law), *aff'd*, 585 N.E.2d 1336 (Ind.1992)) (footnote added).)[4]

---

3. Caesars claims that under the two RWT rate structure a flat tax rate was imposed prior to the implementation of flexible scheduling and the graduated rates were imposed once a riverboat implemented flexible scheduling. (*See* Pet'r Br. at 8–9.) According to Caesars, by converting to the single RWT rate structure, the legislature intended that once a riverboat implements flexible scheduling, the graduated rates are imposed on all receipts received during that entire year. *(See* Pet'r Br. at 9.)

Therefore, Caesars contends that its July 2002 receipts should have been taxed at the 15% tax rate since Caesars did not make its first $25,000,000 of adjusted gross receipts for the period until August 3, 2002. As such, Caesars claims that the correct retroactive RWT assessment was $2,744,001 (i.e., the difference between the 15% tax rate and 22.5% rate imposed on the July 2002 receipts) and not the Department's proposed assessment of $4,390,402.

4. Caesars has offered a three-sentence argument as to why it thinks the legislature wanted to make that retroactive change to the law: [the] application of two different rates to the same activity by similarly situated riverboat owners would be unconstitutional as a violation of the equal protection guarantees set forth in both the Fourteenth Amendment to the U.S. Constitution and the Article 1, § 23 of the Indiana Constitution. The General Assembly does not intend such an unfair, inconsistent and unconstitutional application of the RWT rates to riverboat owners. The fair and logical interpretation of the legislature's rate scheme is that the General Assembly intended to apply only one tax rate structure to the total RWT paid by a riverboat during the twelve-month tax period.

(Pet'r Br. at 10 (internal citation omitted) (emphasis in original omitted).) Caesars's argument, however, does not trigger an equal protection analysis.

This Court has explained that an equal protection analysis (under both federal and state Constitutions) is implicated only if an individual has been treated differently from other similarly situated persons. *See UACC Midwest, Inc. v. Indiana Dep't of State Revenue*, 667 N.E.2d 232, 238–239 (Ind. Tax Ct.1996) (stating that the Equal Protection Clause "simply keeps governmental decision makers from treating differently persons, who in all relevant respects are alike"). Caesars com-

Caesars admits the reference in Indiana Code § 4–33–13–1.5(g) to "adjusted gross receipts received while the riverboat implements flexible scheduling" *"appears to be inconsistent"* with its single RWT rate structure interpretation. (Pet'r Proposed Findings of Fact and Conclusions of Law at 7, ¶ 10 (emphasis added).) Caesars suggests the inconsistency can be remedied by interpreting "while the riverboat implements flexible scheduling" to mean "at any time during a year while the riverboat implements [flexible scheduling]." (Oral Argument Tr. at 16–17. *See also* Pet'r Br. at 11.)

The Department, on the other hand, argues that Caesars's interpretation of the statute "confuses (1) the imposition of the [RWT] based upon a graduated rate schedule with (2) the selection [or computation] of the proper graduated rate." (Pet'r Pet., Ex. 3 at 3.) In other words, the Department claims the statutory language clearly specifies that the graduated rates are to be imposed *"while"* the riverboat implements flexible scheduling; however, the graduated rates are *determined* based on the adjusted gross receipts received during the entire year. The Court agrees.

When construing a statute, the Court's foremost goal is to determine and give effect to the legislature's intent in enacting the statutory provision in dispute. *Mynsberge v. Dep't of State Revenue,* 716 N.E.2d 629, 632 (Ind.Tax Ct.1999); *Johnson County Farm Bureau Co-op. Ass'n v. Indiana Dep't of State Revenue,* 568 N.E.2d 578, 580 (Ind. Tax Ct.1991), aff'd, 585 N.E.2d 1336 (Ind.1992). Generally, the best evidence of this intent is found in the actual language chosen by the legislature. *Mynsberge,* 716 N.E.2d at 632. As such, the Court must read the statute to give effect to every word and "will avoid an interpretation that renders any part of the statute meaningless or superfluous." *Enterprise Leasing Co. of Chicago v. Indiana Dep't of State Revenue,* 779 N.E.2d 1284, 1294 (Ind. Tax Ct.2002) (citation omitted), *review denied.* Furthermore, words and phrases will be taken in their plain, ordinary and usual sense, unless such a construction is plainly repugnant to the intent of the legislature or the context of the statute. *See Johnson County Farm Bureau,* 568 N.E.2d at 580–581. Finally, despite the fact that tax imposition statutes are strictly construed against the imposition of the tax, the policy of strict construction will not override the plain language of a statutory provision. *Mynsberge,* 716 N.E.2d at 633 (citations omitted).

Indiana Code § 4–33–13–1.5(b), as enacted, was ambiguous as to when a riverboat's adjusted gross receipts were subject to the 15% graduated tax rate. *See* P.L. 192–2002(ss), § 25(b). Indeed, in 2002, subsections (b)(1)-(5) imposed each tax rate based on a corresponding amount of adjusted gross receipts "received during the period beginning July 1 of each year and ending June 30 of the following year."

plains that the "same activity" is subject to two different tax rate structures. Excursion gaming and flexible scheduling, however, are not the same activity (and Caesars has not argued or demonstrated that the activities are one in the same). As a result, RWT rates are based on the type of activity in which a riverboat engages. *See* IND.CODE ANN §§ 4–33–13–1 (West 2003); A.I.C. § 4–33–13–1.5.

More importantly, *individuals* are afforded equal protection guarantees, not activities.

*See* U.S. CONST. amend. XIV, § 1; IND CONST. art. 1, § 23. *See also UACC Midwest,* 667 N.E.2d at 238–239. Caesars has not argued, nor demonstrated, that it has been treated differently from any other riverboat casino. In fact, Caesars claims that the other ten Indiana riverboat casinos originally paid RWT in 2002 the same way it did and were also later assessed with additional RWT in 2003. (*See* Pet'r Pet. at 4–5.)

A.I.C. § 4–33–13–1.5(b)(1)–(5) (West 2002). The last sentence of subsection (b), however, stated that the rates imposed applied to "adjusted gross receipts received beginning the date flexible scheduling [was] implemented[.]" A.I.C. § 4–33–13–1.5(b) (West 2002). Consequently, as Caesars points out, it (as well as other Indiana riverboat casinos) began calculating its first $25 million of adjusted gross receipts and applying the 15% tax rate starting on the date that it implemented flexible scheduling. (Pet'r Pet. at 4–5.)

In 2003, during the next legislative session, the legislature clarified its intent when it deleted the last sentence in subsection (b) and added subsections (g) and (h).[5] Particularly, subsection (g) clarifies the ambiguity regarding the application of the graduated rates by stating that when flexible scheduling is implemented, the graduated rates are to be imposed on adjusted gross receipts received *while* the riverboat implements flexible scheduling, but the *rate* is computed *"as if* the riverboat had engaged in flexible scheduling during the entire period beginning July 1 of each year and ending June 30 of the following year." *See* A.I.C. § 4–33–13–1.5(g) (West 2003) (emphasis added). The repetition of the language "beginning July 1 of each year and ending June 30 of the following year" is indicative of the legislature's intent to explain more clearly what it meant in subsection (b). Likewise, the use of the words "as if" indicates that the legislature did not intend to impose the graduated rates during the entire period, unless flexible scheduling is actually implemented. *See id.*

The non-code provision further clarifies the legislature's intent.[6] *See* P.L. 224–2003, § 48 (footnote added). Specifically, in subsections (c) and (d) the legislature makes it clear that it "does not acquiesce in any interpretation of 4–33–13–1.5" that excludes receipts received before flexible scheduling was implemented from the determination of which graduated rate applies to receipts received once flexible scheduling is implemented. *See* P.L. 224–2003, § 48(c). In other words, the legislature acknowledged that Indiana Code § 4–33–13–1.5, as enacted, resulted in an interpretation that receipts received before the implementation of flexible scheduling were not included in the determination of which rate applied, and it wanted to make it clear that such an interpretation was not what it intended. Moreover, subsection (d) of the non-code provision clarifies that the tax rates are imposed on adjusted gross re-

---

5. *See* A.I.C. § 4–33–13–1.5 (West 2003) (eff.7–1–02). *See also Johnson County Farm Bureau Co-op. Ass'n v. Indiana Dep't of State Revenue,* 568 N.E.2d 578, 585 (Ind. Tax Ct.1991) (stating that the deletion of statutory language will not raise a presumption of an intentional change in the law if it is apparent that the amendment was made only to express more clearly the original intention of the legislature).

6. Caesars claims the non-code provision is inapplicable in this case because the issue before the Court is which rate applies to its July 2002 adjusted gross receipts (i.e., before it implemented flexible scheduling) and the non-code provision specifies that it is only applicable to receipts received on or after a riverboat implements flexible scheduling and before July 1, 2003. (*See* Oral Argument Tr. at 17–18.) The Court finds this argument contradictory to Caesars's single RWT rate structure interpretation.

If, as Caesars suggests, the legislature was truly creating a single RWT rate structure, once a riverboat implemented flexible scheduling the graduated rates would be imposed on all adjusted gross receipts received during that entire year. As such, a provision explaining the calculation of the graduated tax rates and collection of the corresponding taxes would be relevant to Caesars's July 2002 receipts. In any event, the non-code provision is applicable in the case because it further emphasizes how to calculate the applicable rate. *See* P.L. 224–2003, § 48.

ceipts received "on or after" the date that the riverboat implements flexible scheduling and must be selected based on a calculation that included the adjusted gross receipts from the entire period.

The legislature is presumed to mean what it says. *Mynsberge,* 716 N.E.2d at 634. In making the 2003 amendments, the legislature chose to express its intent in a clear manner using plain and ordinary words, and it even provided extra guidance as to the meaning of Indiana Code § 4–33–13–1.5 in the non-code provision. If the legislature had indeed intended to impose a single RWT rate structure, it could have made that intention clear in the non-code provision; it did not. The legislature also did not voice that intent in any of the existing statutory language. This Court will enforce the tax statutes as written. *See Kohl's Dep't Stores, Inc. v. Indiana Dep't of State Revenue,* 822 N.E.2d 297, 301–02 (Ind. Tax Ct.2005).

### CONCLUSION

For the foregoing reasons, the Court now GRANTS summary judgment in favor of the Department and against Caesars.

SO ORDERED this 5th day of October, 2006.