**WORMAN ENTERPRISES, INC.,**
**Appellant–Defendant,**

v.

**THE BOONE COUNTY SOLID**
**WASTE MANAGEMENT DIS-**
**TRICT, Appellee–Plaintiff.**

No. 06A01–0206–CV–202.

Court of Appeals of Indiana.

Dec. 5, 2002.

Mark R. Waterfill, Cynthia M. Kirk, Dann Pecar Newman & Kleiman, P.C., Indianapolis, IN, Attorneys for Appellant.

Larry J. Kane, Katherine L. Shelby, Bingham McHale, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Worman Enterprises, Inc. (Worman) appeals the trial court's grant of summary judgment on its declaratory judgment action against the Boone County Solid Waste Management District (District). In its action, Worman challenged the District's authority to issue a permit regulating Worman's long-term clean fill processing and organic recycling facility, the permit application process, and the content of the permit that it received. While we find as a matter of law that the District does have the authority to institute a permit system that regulates Worman's facility, we conclude that there is a genuine issue of material fact concerning the permit application process that renders summary judgment inappropriate. We therefore reverse and remand for further proceedings.

### Facts and Procedural History

Worman operates a long-term clean fill processing and organic recycling facility in Boone County. Worman's facility takes in trees, brush, leaves, grass, and dirt and then sells the resulting lumber, mulch, and topsoil products. The facility also accepts concrete, bricks, and stone, which are then resold to the public. Worman's business has been in operation since 1984. The District is a county solid waste management district established pursuant to Indiana Code § 13–21–3–1.

On September 9, 1998, the District's Board (Board) adopted Resolution 98–3, which "prescribe[d] certain requirements for the permitting and operation of solid waste facilities and clean fill sites within the Boone County Solid Waste Management District" and updated a 1995 resolution adopted by the Board. Appellant's App. p. 534. Prior to the adoption of Resolution 98–3, the District brought suit against Worman alleging that its operations "constitute an illegal and unpermited clean fill site over which the District has permitting authority." Appellant's App. p. 50. Worman countered that it was not subject to the permitting and oversight of the District. On October 6, 1998, the District and Worman filed a Settlement Agreement and Release in that case. Under the Settlement Agreement, the District agreed to dismiss the lawsuit, and Worman agreed to (1) promptly file for a Long–Term Clean Fill Processing and Recycling Facility Permit; (2) pay $2,000 to a community school upon issuance of the permit; (3) provide the District with monthly reports reflecting the material received and sold; and (4) allow the District access to its facility. Appellant's App. p. 51–52. However, if the permit was not issued to Worman or issued with unacceptable conditions, the Settlement Agreement was to be of no effect.

On July 28, 1999, Worman submitted an application for a permit. Originally the application was incomplete; however, after the application was supplemented, the Board notified Worman that its application would be heard at the District's July 12, 2000, public meeting. On July 12, 2000, the Board received information from Worman and comments from the public, but no action was taken on the application because the Board did not have a quorum. A special meeting was then held on the application on July 25, 2000, where more public comments were heard, but any action on the application was tabled to the next meeting. No action was taken by the Board at its August 15, 2000, meeting because of a lack of quorum. At its September 13, 2000, meeting, the Board took additional public comments on the application but postponed action on the application because Worman had submitted a solid waste processing facility application in-

stead of a clean fill processing and recycling application. Following the meeting, Worman submitted a revised permit application.

Following the Board's October 11, 2000, meeting, the District issued Worman a Long Term Clean Fill and Recycling Permit. On November 13, 2000, Worman filed a Verified Complaint for Declaratory Judgment Action against the District alleging that certain terms contained in the permit were unlawfully imposed and that the District did not have the authority to issue the permit. The District filed its Motion for Summary Judgment on February 19, 2001. After a summary judgment hearing, the trial court granted the motion on May 7, 2002, dismissing Worman's complaint. This appeal ensued.

### Discussion and Decision

In appealing the trial court's grant of summary judgment Worman raises a number of issues challenging the District's authority to issue a permit for its facility, the permit application process, and the content of the permit. Specifically, Worman asserts that the District is preempted from regulating its facility pursuant to the Home Rule Act. Worman also argues that *ex parte* communications between the public and the Board during the District's permit application proceedings violated Worman's due process rights. Finally, Worman argues that some provisions in its permit are unconstitutionally vague, overly broad, and are not provided for in Resolution 98–3 and that there are genuine issues of fact as to whether provisions in the permit violate Worman's due process and equal protection rights.

When reviewing the grant or denial of a motion for summary judgment our standard of review is the same as that used by the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *City of New Haven v. Chem. Waste Mgmt. of Ind., L.L.C.,* 701 N.E.2d 912, 921–22 (Ind.Ct.App.1998); *trans. denied;* Ind. Trial Rule 56(C). A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue. *Steuben County v. Family Dev., Ltd.,* 753 N.E.2d 693, 699 (Ind.Ct.App. 2001), *reh'g denied, trans. denied.* On review, we do not reweigh the evidence, but will consider the facts in the light most favorable to the nonmoving party. *City of Gary v. Ind. Bell Tel. Co., Inc.,* 732 N.E.2d 149, 153 (Ind.2000). A question of statutory interpretation is a question of law which we will review de novo. *Spears v. Brennan,* 745 N.E.2d 862, 869 (Ind.Ct.App. 2001), *reh'g denied.*

### I. Home Rule

Worman asserts that the District does not have the authority to issue a permit for the facility. Our analysis begins by looking to Indiana's Home Rule Act. Ind. Code ch. 36–1–3. The Home Rule Act abrogated the traditional rule that local governmental units possessed only those powers expressly authorized by statute and declared that a local government possesses "[a]ll other powers necessary or desirable in the conduct of its affairs." *Ind. Bell Tel. Co., Inc.,* 732 N.E.2d at 153 (quoting Ind.Code § 36–1–3–4(b)(2)). In addition, the Home Rule Act provides that "[a]ny doubt as to the existence of a power of a unit shall be resolved in favor of its existence." *Raab v. Town of Schererville,* 766 N.E.2d 790, 792–93 (Ind.Ct.App.2002) (quoting Ind.Code § 36–1–3–3), *trans. denied.* A unit may exercise "all powers granted it by statute; and all other powers necessary or desirable in the conduct of its affairs, even though not granted by statute." *Id.* at 793 (quoting Ind.Code § 36–

1-3-4). However, the Home Rule Act specifically dictates that a local governmental unit does not have the "power to regulate conduct that is regulated by a state agency; except as expressly granted by statute." *Hopkins v. Tipton County Health Dep't,* 769 N.E.2d 604, 608 (Ind.Ct.App. 2002) (quoting Ind.Code § 36-1-3-8(7)).

Worman argues that pursuant to the Home Rule Act, the District's power to regulate Worman's facility is preempted by state law that establishes the Indiana Department of Environmental Management's authority to regulate solid waste. *See* Ind.Code §§ 13-15-1-3, 13-19-2-1, 13-19-3-1. However, the Home Rule Act only applies to "units." I.C. § 36-1-3-1; *Durkes v. Town of Converse,* 572 N.E.2d 530, 532 n. 3 (Ind.Ct.App.1991), *trans. denied.* For purposes of the Home Rule Act, a "unit" is defined as a county, municipality, or township. Ind.Code § 36-1-2-23; *Schlehuser v. City of Seymour,* 674 N.E.2d 1009, 1013 (Ind.Ct.App.1996).

■ A solid waste management district is a creature of statute composed of counties or groups of counties and created for the purpose of making solid-waste policy at the local level. *See* Indiana Code ch. 13-21-3; 1998 Ind. Op. Atty. Gen. No. 02. Under Indiana Code § 13-21-3-1(a), each county in Indiana is required to join with additional counties in establishing a joint solid waste management district or to designate itself as a county solid waste management district. *See also* 1998 Ind. Op. Atty. Gen. No. 02. If a county fails to designate itself as a county solid waste management district or to join with other counties in forming a joint district, the commissioner of the department of environmental management designates the county as a county solid waste management district. *See* I.C. § 13-21-3-1(d). As established by Indiana Code ch. 13-21-3, we find that the Indiana General Assembly designed solid waste management districts to be entities distinct from counties, municipalities, or townships. Therefore, we find that solid waste management districts would not fall under a strict definition of "unit" as provided by Indiana Code § 36-1-2-23.

■ Moreover, even under an expansive interpretation, we find that a solid waste management district could not be equated with any of the governmental entities that are considered "units" for purposes of the Home Rule Act. Solid waste management districts were not created pursuant to county, municipal, or township ordinances and do not serve as agents or instrumentalities of those governmental entities. Instead, solid waste management districts were created by state statute, and the only control that a county has over a district's existence is whether the district will be a single county or joint solid waste management district. *See* I.C. § 13-21-3-1; *but see Hochstedler v. St. Joseph County Solid Waste Mgmt. Dist.* 770 N.E.2d 910, 920 (Ind.Ct.App.2002) (stating that a county government creates a district per I.C. § 13-21-3-1(a)), *trans. denied.* In addition, "[a]ll of the incorporated and unincorporated territory of a county must be included in the designated county solid waste management district or the joint solid waste management district to which the county belongs." Ind.Code § 13-21-3-2. The board of directors in both a county and joint district is made up of members representing the county and municipal governments contained within the district. *See* Ind.Code §§ 13-21-3-5 to -6. Moreover, the existence of joint solid waste management districts containing multiple counties, municipalities, and townships within the districts' borders insures that "solid waste management district" could not fall under the current definition of "unit." Because solid waste manage-

ment districts do not fall under the definition of "unit," we find that the Home Rule Act is inapplicable.[1]

■ With solid waste management districts falling outside the Home Rule Act, we find that the districts are governed by the traditional rule that once applied to local governmental units. *Ind. Bell Tel. Co., Inc.*, 732 N.E.2d at 153; *City of South Bend v. Krovitch*, 149 Ind.App. 438, 444–45, 273 N.E.2d 288, 291–92 (1971). Under the traditional rule, Indiana courts recognized that municipal corporations such as solid waste management districts "are creatures of the state. They possess such powers only as are granted by the Legislature in express words and those necessarily implied and incidental to those expressly granted, and those indispensable to the declared objects and purposes of the corporation, and to its continued achievements." *Dunn v. City of Indianapolis*, 208 Ind. 630, 640, 196 N.E. 528, 532 (1935). Unlike units falling under the Home Rule Act, a solid waste management district is limited to only the powers expressly granted by the General Assembly.

The powers of a solid waste management district are enumerated in Indiana Code § 13–21–3–12, which provides in pertinent part:

the powers of a district include the following:

(1) The power to develop and implement a district solid waste management plan under IC 13–21–5.

. . . .

(16) The power to otherwise do all things necessary for the:

(A) reduction, management, and disposal of solid waste; and

(B) recovery of waste products from the solid waste stream;

if the primary purpose of activities undertaken under this subdivision is to carry out the provisions of this article.

(17) The power to adopt resolutions that have the force of law. However, a resolution is not effective in a municipality unless the municipality adopts the language of the resolution by ordinance or resolution.

Arguably, the power granted under Indiana Code § 13–21–3–12 would allow a solid waste management district the authority to adopt a resolution establishing a permit system if the permit system was necessary for the reduction, management, and disposal of solid waste.

The powers of a solid waste management district are also subject to various limitations. Under Indiana Code § 13–21–3–14, the powers of a district do not include the following:

(1) The power of eminent domain.

(2) Except as provided in subsection (b), the power to exclusively control the col-

---

1. While a solid waste management district does not fall under the definition of "unit," it does fall under the definition of "municipal corporation." Indiana Code § 36–1–2–10 establishes:

"Municipal corporation" means unit, school corporation, library district, local housing authority, fire protection district, public transportation corporation, local building authority, local hospital authority or corporation, local airport authority, special service district, *or other separate local*

*governmental entity that may sue and be sued.* The term does not include special taxing district.

(emphasis added). A solid waste management district has "[t]he power to sue and be sued." Ind.Code § 13–21–3–12(4). In addition, a solid waste management district would qualify as a political subdivision under Indiana Code § 36–1–2–13, which provides, "'Political subdivision' means municipal corporation or special taxing district."

lection or disposal of any solid waste or recyclables within the district by means that include the following:

(A) Franchising.

(B) Establishing a territory or territories within the district in which a person may provide service.

(3) The power to establish the type of service that a person must provide for the collection or disposal of solid waste or recyclables within the district.

(4) The power to establish fees that a person must charge for the collection or disposal of solid waste or recyclables within the district.

In addition, Indiana Code § 13–21–3–14.5 places limits on a district's ability to provide waste management services by means of its own work force or by contracting with others to provide those services. However, unlike units governed by the Home Rule Act, a district is not subject to the preemption constraint that provides that units do not have power "to regulate conduct that is regulated by a state agency, except as expressly granted by statute." I.C. § 36–1–3–8(7).

▬ Because the General Assembly granted solid waste management districts the power to promulgate regulations and to do all things necessary for the reduction, management, and disposal of solid waste within their borders, we find that the District has the power to adopt a resolution that prescribes certain requirements for the permitting and operation of solid waste facilities within that solid waste management district. In addition, we find

that the General Assembly did not place any limitations on a solid waste management district's power that would prevent the District from creating such a permit system. As long as the District's permit system mandates what materials cannot be accepted at a solid waste disposal site instead of dictating what type of materials must be accepted at a site, we find that the permit system does not violate Indiana Code § 13–21–3–14. We also find that the District's authority to establish a permit system would not be preempted by state law establishing the Indiana Department of Environmental Management's authority to regulate solid waste because a solid waste management district is not subject to that type of preemption constraint. Therefore, we conclude that the District acted within its authority when it adopted Resolution 98–3 and that the District has the authority to institute a permit system and to regulate solid waste facilities and clean fill sites within the solid waste management district.

## II.  Ex parte *Communications*

▬ Worman also asserts that *ex parte* communications between members of the Board and the public during the permit application process violated Worman's due process rights.[2] While the Board granted Worman a permit to run the facility, Worman asserts that *ex parte* communications still violated its due process rights because the communications resulted in additional conditions being placed in the permit.

**2.** The District's proceedings are not governed by the Indiana Administrative Orders and Procedures Act (AOPA) because the District is a political subdivision and is therefore not an "agency" within the contemplation of the Act. Ind.Code §§ 4–21.5–1–3, 4–21.5–2–3; *Lake County Sheriff's Corrections Merit Bd. v. Peron,* 756 N.E.2d 1025, 1028 (Ind.Ct.App.

2001). Thus, AOPA's provisions regarding *ex parte* communications are inapplicable, and any analysis concerning the propriety of *ex parte* communications during the District's permit application process is limited to the communication's effect on Worman's due process rights.

■ Indiana follows the rule that a final administrative decision is a denial of due process when the administrative authority considers evidence received outside the presence of a party who is without notice of its consideration and who is not afforded an opportunity to rebut the evidence. *State Bd. of Tax Comm'rs v. Oliverius*, 156 Ind.App. 46, 54, 294 N.E.2d 646, 651 (1973).

> As a general proposition, it is not proper for an administrative authority to base a decision of adjudicatory nature, or findings in support thereof, upon evidence or information outside the record, and in particular upon evidence obtained without the presence of and notice to the interested parties, and not made known to them prior to the decision.

18 A.L.R.2d 555 (1951); *see also Oliverius*, 294 N.E.2d at 651 (Hoffman, J., dissenting). While there are occasions where an administrative authority may consider evidence not made a part of the formal or informal hearing, the authority must then make such *ex parte* "evidence known and available to such parties and allow them the opportunity to meet and rebut the *ex parte* evidence." *Oliverius*, 294 N.E.2d at 651 n. 4. However, due process rights are not violated if the administrative authority does not rely on or consider the *ex parte* evidence in arriving at its decision. *Gagne v. Trustees of Ind. Univ.*, 692 N.E.2d 489, 494 (Ind.Ct.App.1998), *trans. denied.*

■ The requirement that an administrative authority's decision to approve or deny a permit application should be based on the evidence presented at a hearing does not imply that an authority's "members are to be held to the same degree of detachment as members of the judicial community, who are required, pursuant Cannons 2 and 3 of the Indiana Code of Judicial Conduct, to maintain their impartiality and to refrain from allowing relationships to interfere with their judicial conduct or judgment." *Ripley County Bd. of Zoning Appeals v. Rumpke of Ind., Inc.*, 663 N.E.2d 198, 205 (Ind.Ct.App.1996), *reh'g denied, trans. denied.* In *Rumpke of Indiana, Inc.*, this Court considered an allegation that *ex parte* communications improperly persuaded members of a board of zoning appeals (BZA) to vote against an application for special exception to expand a landfill. In finding that the applicant for landfill expansion was not prejudiced by the BZA members receiving information beyond that presented at a hearing, we noted that "while we do not condone zoning boards taking a poll of their neighborhoods, boards are not expected to be unaware of the overall sentiment, including legitimately expressed concerns, of other members of the community." *Id.* (citing *Stout v. Mercer*, 160 Ind.App. 454, 463, 312 N.E.2d 515, 520 (1974)). Similarly, other administrative authorities, like the Board, are not expected to be ignorant of the overall public sentiment on an issue. However, this general awareness and concern must not overshadow or outweigh the evidence properly submitted to them in their capacities as board members. *Id.*

■ Thus, in determining whether the receipt of *ex parte* evidence by an administrative authority was prejudicial error, we apply a three-prong test: (1) did the administrative authority exercise a function of an adjudicatory nature; (2) did the administrative authority fail to make known and available the *ex parte* evidence to the affected party and allow that party the opportunity to rebut the evidence; and (3) did the administrative authority base its findings or decision on that *ex parte* evidence. *See Gagne*, 692 N.E.2d at 494; *Rumpke*, 663 N.E.2d at 205; *Oliverius*, 294 N.E.2d at 651; *Doran v. Bd. of Educ. of Western Boone County Cmty. Sch., Thorntown*, 152 Ind.App. 250, 267–69, 285

N.E.2d 825, 829 (1972). If an administrative authority received *ex parte* evidence and all three prongs of the test are answered in the affirmative, then the receipt of the *ex parte* evidence will be prejudicial error.

In this case, there is undisputed evidence that there were *ex parte* communications between the public and members of the Board during the application process for Worman's permit. During deposition testimony, Board member Wendella Brant acknowledged that she received approximately 25–30 home phone calls from members of the public regarding the Worman permit and that she had conversations on the issue with members of the public at the grocery store and the post office. In addition, Brant admitted that she accepted an invitation from a neighbor of the Worman facility to go to his home in order to observe scrap telephone poles on Worman's property. Appellant's App. p. 755. According to a signed affidavit and the District's answers to Worman's second set of interrogatories, Board member Richard Crane admitted that he received a telephone call from John Notarianni regarding his concerns with the Worman permit. Appellee's App. p. 2. Crane informed Notarianni "that the Board could issue a permit to Worman and thereafter, it would be determined whether or not the operations of the Facility met the terms of the permit." Appellant's App. p. 780. Finally, in a signed affidavit, Board member Kay Geisler affirmed that she received approximately ten telephone calls from neighbors of the Worman Facility expressing their concerns about the facility. Appellee's App. p. 5. While Geisler could not remember the names of the individuals who called, she asserted that she did not discuss any issues about the terms of the Worman permit with those individuals. Because there is undisputed evidence that members of the Board received *ex parte*

evidence during the permit application process, we apply the three-prong test to determine whether the receipt of that *ex parte* evidence was prejudicial error.

■ Turning to the first step of the test, we address whether the Board was exercising its rulemaking or adjudicatory function when it issued the permit to Worman. The administrative rulemaking function, which results in administrative rules, is distinguished from the adjudicatory function, which results in administrative orders, in that the former involves an element of generality and operates prospectively upon a class of individuals while the latter operates retrospectively upon a particular individual or circumstance. *Miller Brewing Co. v. Bartholemew County Beverage Co., Inc.*, 674 N.E.2d 193, 202 (Ind. Ct.App.1996), *trans. denied*. Indiana Code §§ 4–21.5–1–9 and –14, though not directly applicable to administrative authorities of less than statewide jurisdiction such as the Board, also provide some general guidelines to distinguish between quasi-judicial and quasi-legislative actions:

Sec. 9. "Order" means an agency action of particular applicability that determines the legal rights, duties, privileges, immunities, or other legal interests of one (1) or more specific persons. The term includes:

(1) a license;

Sec. 14. "Rule" means the whole or any part of an agency statement of general applicability that:

(1) has or is designed to have the effect of law; and

(2) implements, interprets, or prescribes:

(A) law or policy; or

(B) the organization, procedure, or practice requirements of an agency.

*See Bradley v. Bankert,* 616 N.E.2d 18, 22 (Ind.Ct.App.1993), *reh'g denied, trans. denied.* In issuing Worman a Long Term Clean Fill and Recycling Permit, the Board's action was one of particular applicability concerning the private rights of only one company. Therefore, we find that the Board exercised its adjudicatory function when it issued the permit to Worman.

The two remaining parts of the test reveal genuine issues of material fact that preclude summary judgment. As moving party in a motion for summary judgment, the District bore the burden of making a *prima facie* showing by designating affidavits and other evidence that there were no genuine issues of material fact. *Carroll v. Jagoe Homes, Inc.,* 677 N.E.2d 612, 612 (Ind.Ct.App.1997), *trans. denied.* While all of the enumerated conditions in the Worman permit were discussed in the public hearings and were present in earlier permit drafts that were submitted to Worman, the District did not designate evidence revealing whether Worman was made aware of all of the *ex parte* communications between the Board and the public on the issue and whether Worman was given an opportunity to rebut this evidence. Board member Brant acknowledged during the Board's September 13, 2000, hearing on Worman's permit application that she had received phone calls at home on the issue. Appellant's App. p. 419. However, the substance of Brant's conversations does not appear to have been made known to Worman. In addition, the record is silent as to whether Geisler and Crane made known their *ex parte* communications to Worman during the application process.

As to the last prong of the test, Brant testified during her deposition that the calls and comments she received did not influence her views on the Worman permit.

Appellant's App. p. 750. In affidavits, Geisler and Crane affirmed that *ex parte* evidence was not the basis for their decision on Worman's permit. Appellee's App. p. 3, 5–6. While these assertions if deemed credible would establish that no prejudicial error resulted from the Board member's receipt of *ex parte* evidence, summary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony. *Century Bldg. P'ship, L.P. v. SerVaas,* 697 N.E.2d 971, 974 (Ind.Ct. App.1998).

On a motion for summary judgment, the evidence must be construed in favor of the nonmovant, and any doubt about the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* Because we must resolve any doubt about the existence of genuine issue of material fact in favor of Worman, we find that the trial court erred in deciding this issue on summary judgment. While it may be that the receipt of *ex parte* evidence during the District's permit application proceedings was not prejudicial error, this decision should not have been made on summary judgment.

### Conclusion

While we find as a matter of law that the District does have the authority to issue permits like the one it issued to Worman, we find that there is a genuine issue of material fact as to whether the receipt of *ex parte* evidence during the permit application process was prejudicial error. Because there is a question concerning the propriety of the permit application process, we will not determine whether the provisions contained within the actual permit are unconstitutionally vague, overly broad, not provided for in Resolution 98–3, and violate Worman's due process and equal protection rights. Therefore, we reverse and remand to the

trial court for further proceedings to determine whether the receipt of *ex parte* communications during the application process resulted in prejudicial error and to consider Worman's challenges to the permit provisions.

Affirmed in part, reversed in part, and remanded for further proceedings.

BAKER and BARNES, JJ., concur.